In re Richard A. SAMAD, Respondent.

A Suspended Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 462384).

No. 11–BG–776.

District of Columbia Court of Appeals.

Submitted April 24, 2012.

Decided Sept. 5, 2012.

John O. Iweanoge, II, was on the brief for respondent.

Wallace E. Shipp, Jr., Bar Counsel, Judith Hetherton, Senior Assistant Bar Counsel and Becky Neal, Assistant Bar Counsel, were on the brief for the Office of Bar Counsel.

Before WASHINGTON, Chief Judge, and FISHER and EASTERLY, Associate Judges.

PER CURIAM:

Having found that Respondent, Richard A. Samad, committed 40 violations of 14 different Rules of Professional Conduct in six matters, the Board on Professional Responsibility has recommended: (1) that Respondent be suspended for the maximum period of three years; (2) that Re-

spondent should be required to demonstrate his fitness to practice law before he is reinstated; and (3) that, as a condition of reinstatement, Respondent should be required to make restitution to one of his clients, Mr. Williams, in the amount of $2,500 plus interest at the legal rate. The facts underlying the Board's recommendation are largely undisputed, but Respondent has nevertheless noted a variety of exceptions to the Board's legal conclusions and recommended sanction. For the reasons stated below, we find no merit to Respondent's exceptions, and we adopt the Board's recommended sanction.

## I. Background

Respondent was charged by Bar Counsel with 55 violations of the District of Columbia Rules of Professional Conduct ("Rules") in connection with his representation of six clients during a five-year period. The Hearing Committee held four days of hearings and concluded that Respondent had committed 40 violations of the Rules in connection with these six matters. It recommended that Respondent be suspended for 21 months, that he be required to demonstrate his fitness to practice law before being reinstated, and that he make restitution to one of his clients in the amount of $2,500 plus interest at the legal rate as a condition of reinstatement. With limited exceptions, the Board adopted the Hearing Committee's factual findings and found that the Hearing Committee's conclusions of law were supported by clear and convincing evidence. However, in light of the number of violations, the pattern of conduct revealed during the hearing, and Respondent's failure to comprehend the obligations he assumed under the Rules or to take responsibility for his failure to abide by such obligations, Bar Counsel requested and the Board recommended a longer (three-year) period of suspension. Except as otherwise noted, Respondent does not take exception to any of the Board's factual findings, which are summarized below.

## A. The Williams Matter

Duane Williams was charged with a felony drug violation and was free on his own recognizance pending trial when he retained Respondent after Respondent contacted him. Respondent replaced Mr. Williams' court-appointed lawyer. The case was set for a jury trial to begin on January 8, 2004, before Judge Retchin. Respondent did not appear as scheduled to begin trial. When he finally appeared, he advised Judge Retchin that he was "in trial" or "completing a trial" with Judge Ross. In fact, the evidentiary portion of that trial had concluded and the jury had begun deliberations. When pressed by Judge Retchin, Respondent acknowledged the true status of his case before Judge Ross. He then asserted that he was unprepared to go to trial and requested a continuance, which the judge denied.

Mr. Williams was in the courtroom during this discussion and was aware that Respondent was not prepared for trial. Respondent had not talked to any of the witnesses suggested by Mr. Williams or undertaken any other investigation or pre-trial preparation, had not prepared or filed any pre-trial motions, had not filed a motion to suppress Mr. Williams' confession, had not drafted or sent a "Rosser" letter, and had not prepared an opening statement. Rather, Respondent testified that he planned to employ a "set-up" defense based on his review of the file, his conferences with the client, and possibly the testimony of the arresting police officers.

When Mr. Williams learned that the trial was going forward, he "went into a panic because [he] had no defense prepared." He was also concerned that he had not received a plea offer. Mr. Williams left

the courtroom during a break while the jury panel was brought to the courtroom. When Mr. Williams did not return to the courtroom, Judge Retchin issued a bench warrant for his arrest. Once apprehended, Mr. Williams requested a new lawyer, and his request was granted.

The Board found substantial evidence to support the Committee's findings and violations of Rules 1.1(a) (failing to provide competent representation), 1.1(b) (failing to serve a client with the skill and care commensurate with that generally afforded to clients by other lawyers in similar matters), 1.3(a) (failing to represent a client zealously and diligently), 1.4(b) (failing to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation), 1.16(d) (failing, upon termination of the representation, to take timely steps to protect a client's interest by refunding any advance payment of unearned fees), 3.3(a)(1) (knowingly making a false statement of material fact or law to a tribunal), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct that seriously interferes with the administration of justice).

## B. The Carthens Matter

Respondent represented Alfred Carthens in a criminal matter, and a jury trial began on March 4, 2004. At the end of the first day, the trial court instructed the parties, Respondent, and the jury panel to return to court the next morning at 11:00 a.m. The next morning, March 5, 2004, Respondent failed to appear at 11:00 a.m. and failed to timely notify the court that he would be late. He arrived in the courtroom at 12:04 p.m. He told the trial judge that he was late for court because he felt ill that morning. He failed to acknowledge the significant disruption caused by his

delay, and expressed no remorse. The trial judge admonished him for his "cavalier" attitude, excused the jury panel, and recused himself from the case.

The Board found substantial evidence to support the Hearing Committee's findings that Respondent violated Rules 3.4(c) (knowingly disobeying an obligation under the rules of a tribunal), and 8.4(d) (engaging in conduct that seriously interferes with the administration of justice).

## C. The McAllister Matter

On March 29, 2004, Andre McAllister was sentenced to one year in prison for violating his probation. On April 26, 2004, prior to retaining Respondent, Mr. McAllister filed a letter with the court requesting a reduction in his sentence.

On April 29, 2004, Mr. McAllister retained Respondent to assist him in obtaining a sentence reduction. Respondent charged Mr. McAllister a flat fee of $1,500, of which Mr. McAllister's fiancée paid $1,250. The retainer agreement provided that Respondent would "study and review [the case] and ... advise Andre McAllister ... on the next best course of action." When Mr. McAllister asked Respondent to file a motion for reduction of sentence, Respondent advised Mr. McAllister that he would require an additional fee of $300 as well as a payment of the outstanding $250 on his initial matter. When neither was paid, Respondent did not file a motion, tell Mr. McAllister that he did not file a motion, or inform Mr. McAllister that he was withdrawing from the matter.

Mr. McAllister was subsequently transferred to a federal correctional facility in Morgantown, West Virginia. He called Respondent from Morgantown twice, once to find out why he had been moved and the second time to request a refund of the legal fee. The record is unclear as to how Respondent responded to the first ques-

tion, but he never produced a copy of the motion and never returned any portion of the fee. Mr. McAllister testified that, with respect to the second call, "he was rushing me off the phone. He really didn't say to [sic] much about it. He said ... he'd talk to me, he's busy ... [he'd] give me a call." Respondent never made any efforts to get back in touch with Mr. McAllister and never returned phone calls from his family. Subsequently, Mr. McAllister filed a "Pro se Motion for Production of Documents" with the court, requesting that it provide him with a copy of the motion. The court contacted Respondent and advised him that no motion had been filed. The court provided Mr. McAllister with a copy of his criminal docket sheet.

The Board found substantial evidence to support the Committee's findings and violations of Rules 1.1(a) (failing to provide competent representation), 1.3(a) (failing to represent a client zealously and diligently), 1.3(b)(1) (intentionally failing to seek the lawful objectives of a client), 1.4(a) (failing to keep a client reasonably informed about the status of a matter or comply with reasonable requests for information), 1.4(b) (failing to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation), and 1.16(d) (failing, upon termination of the representation, to take timely steps to protect a client's interests). The Board also found, based on the Committee's factual findings, that Bar Counsel had established by clear and convincing evidence that Respondent had violated Rule 1.3(c) (failing to act with reasonable promptness in representing a client).

## D. The Montgomery Matter

In August 2006, William Montgomery was held in custody without bond on felony charges and was being represented by a court-appointed attorney. Respondent contacted Montgomery's grandmother, Florence Ginwright, and told her that he could help Montgomery for a fixed fee of $2,500. Ms. Ginwright paid Respondent a portion of the fee. Respondent never told Ms. Ginwright or Mr. Montgomery that he would not perform any services if his full fee was not paid.

On August 30, 2006, Respondent entered his appearance on Mr. Montgomery's behalf. A status conference was scheduled for September 6, 2006. At some point before the scheduled status conference, Ms. Ginwright told Respondent that she could not pay the remainder of his fee, and that Mr. Montgomery's father "was going to get another lawyer." At that point, Respondent ceased his representation of Mr. Montgomery, although he never communicated this to Mr. Montgomery or Ms. Ginwright, and he remained Mr. Montgomery's attorney of record. The September 6, 2006, status conference was rescheduled for September 22, 2006. Respondent failed to appear, and the matter was continued until September 29, 2006. Again, Respondent failed to appear. Respondent never checked to confirm that another attorney had entered an appearance.

The Board found substantial evidence to support the Committee's findings and violations of Rule 1.1(a) (failing to provide competent representation), 1.1(b) (failing to serve a client with the skill and care commensurate with that generally afforded to clients by other lawyers in similar matters), 1.3(a) (failing to represent a client zealously and diligently), 1.3(b)(1) (intentionally failing to seek the lawful objectives of a client), 1.3(b)(2) (intentionally prejudicing or damaging a client during the course of the professional relationship), 1.4(a) (failing to keep a client reasonably informed about the status of a matter or comply with reasonable requests for infor-

mation), 1.4(b) (failing to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation), 1.16(d) (failing, upon termination of the representation, to take timely steps to the extent reasonably practicable to protect a client's interests by giving reasonable notice or allowing time for employment of other counsel), and 8.4(d) (engaging in conduct that seriously interferes with the administration of justice).

### E.   The Hermann Matter

Dr. Annie Hermann, a Tanzanian citizen with a Tanzanian medical degree, retained Respondent on May 1, 2006, to "assist[ ] her efforts to work legally in the United States" after seeing his flyer advertising legal services in immigration matters, including requests for "H1B Visa & Work Permits." At the time, Ms. Hermann was in the United States on a visitor's visa to see relatives. Her visitor's visa would expire on June 21, 2006, and Dr. Hermann wanted to regularize her status before the visa expired. She paid Respondent a retainer of $2,500. He promised her that he would file the H–1B documents with the Immigration and Naturalization Service before her visitor's visa expired.

According to Bar Counsel's expert witness, Palma Yanni, Esq., there are only a limited number of H–1B visas granted in any year, and obtaining one for temporary professional work is difficult, requiring close coordination with the alien's potential employer, who is technically the applicant. When Dr. Hermann retained Respondent, Respondent had not handled any H–1B visa matters, and he did not adequately study the intricacies of obtaining an H–1B visa. Respondent testified that he decided to handle the H–1B matters because they "are big ticket items, in other words, you get higher fees for them."

Respondent never explained the limitations on H–1B visas to Dr. Hermann, did not inform her about the process for obtaining an H–1B visa, and did not take any other steps to see if she might qualify for such a visa. He also did not check with the U.S. Citizenship and Naturalization Service website to learn that at the time he was retained, the quota for H–1B visas for fiscal year 2006 had been reached, or to learn that the filing window for H–1B visas for the fiscal year was about to close. It closed on May 26, 2006, three weeks after Respondent was retained.

Respondent's efforts on Dr. Hermann's behalf were minimal, consisting of revising her resume and sending it to various medical employers. Respondent did not know any of the potential employers to whom he sent the resume and did not follow up after mailing the resume. He also did not provide Dr. Hermann with copies of the mailings until after she terminated his representation. Respondent did not ask her whether she had any relatives in the United States or explore whether she might qualify for another visa that would permit her to remain in the United States. Respondent's client file also did not include copies of her passport, her visa, names and contact information for relatives in the United States, notes of Dr. Hermann's goals, her I–94 form, which states how long a person can stay, or her visa stamp. Yanni testified that Respondent's efforts on Dr. Hermann's behalf were inadequate and failed to meet the standard of care generally afforded clients by competent immigration attorneys. Respondent did not adduce any expert testimony to rebut this testimony and his cross-examination of the expert did not undermine any of that testimony.

Dr. Hermann tried to reach Respondent as the June 21 date approached, but was unable to reach him. As a result, she

retained another lawyer who filed a timely adjustment of status application based on her son's status as a U.S. citizen, regularizing her continued presence in the country. In late 2006, Dr. Hermann terminated Respondent and requested a refund of her fees. Respondent initially refused, but, during a meeting on July 10, 2006, he agreed to refund "either 1,500 or 2,000." When he did not refund either amount, Dr. Hermann sought mandatory arbitration before the District of Columbia Bar Attorney/Client Arbitration Board ("ACAB"). Before the ACAB ruled, Respondent and Dr. Hermann agreed to a settlement pursuant to which Respondent refunded $1,600.

The Board found substantial evidence to support the Hearing Committee's findings that Respondent violated Rules 1.1(a) (failing to provide competent representation), 1.1(b) (failing to serve a client with the skill and care commensurate with that generally afforded to clients by other lawyers in similar matters), 1.3(a) (failing to represent a client zealously and diligently), 1.3(c) (failing to act with reasonable promptness in representing a client), 1.4(a) (failing to keep a client reasonably informed about the status of a matter or comply with reasonable requests for information), 1.4(b) (failing to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation).

## F. The Hill Matter

Sergio Hill was sixteen years old when he was arrested and charged with armed carjacking. He was also suspected of participating in a number of other carjackings, but had not been indicted in any of those cases. If he were convicted of the indicted charge and one of the uncharged offenses, he could have been sentenced to thirty years in prison. Mr. Hill had two co-defendants. It was clear early on in the case that one was cooperating with the government. The second codefendant subsequently agreed to testify against Mr. Hill.

Given his age, Mr. Hill was eligible for sentencing under the Youth Rehabilitation Act, which has no mandatory sentence for armed robbery. Under that Act, he could request that his conviction be expunged upon successfully completing his sentence and probation. Mr. Hill was originally represented by a court-appointed attorney, but his father retained Respondent after Respondent contacted Mr. Hill.

The Assistant U.S. Attorney prosecuting the case, Neal Floyd, offered Mr. Hill a series of plea options, each more favorable to Mr. Hill, but all ultimately required that he plead to the charged offense and one of the other armed carjacking cases. Respondent refused to discuss the plea offers with Mr. Floyd, because Respondent had been retained to represent Mr. Hill only with respect to the charge for which Mr. Hill had been indicted. Respondent advised Mr. Floyd that he should indict Mr. Hill on the uncharged offenses if he wanted to discuss a global plea.

Respondent did not communicate the plea offers to Mr. Hill or inform Mr. Hill or his parents of the other pending charges; nor did he advise them of the implications for Mr. Hill if he was found guilty of multiple armed robbery charges.[1]

---

1. Respondent excepts to the Hearing Committee and Board's finding that "Mr. Hill and his parents were unaware that Mr. Hill was facing a mandatory sentence of fifteen years if convicted of armed carjacking." Respondent suggests that Mr. Floyd's testimony was "speculative." It was not; it was based on his interview with Mr. Hill's parents, during which Mr. Floyd told them that Mr. Hill was facing a mandatory minimum of 15 years if

Indeed, he testified that he did not believe it necessary for him "to run over to the jail every time Mr. Floyd changes the offer ... [as he] knew what [his] client's objectives were."

Mr. Floyd was concerned that Respondent had not adequately discussed the risks Mr. Hill faced or the implications of Respondent's refusal to discuss more than the one indicted offense. Mr. Floyd requested the opportunity to meet with Mr. Hill to explain the plea offers. During that meeting, Respondent discouraged any discussion of the other pending matters. Because Mr. Floyd was concerned that Mr. Hill, "a 16 year old kid," would face a prolonged imprisonment if convicted, Mr. Floyd approached Judge Cushenberry—who had been assigned to the case—to discuss his concerns that Respondent had not explained the plea offers adequately to Mr. Hill or his parents. Judge Cushenberry contacted Respondent and was told Mr. Hill was not interested in entering a global plea. Respondent did so without consulting his client.

On November 15, 2007, the initial trial date, Judge Cushenberry advised Respondent of his concerns that the plea offers had not been communicated to Mr. Hill and questioned Respondent's refusal to discuss a global plea. Respondent indicated at that time that he did not "quite understand what the big deal was because the [R]ules of [P]rofessional [C]onduct allow a lawyer to define what they're doing." Ultimately, the judge converted the trial

date into a status hearing, and continued the trial to November 19, 2007. Respondent advised the judge that he had a civil trial on that date before Judge Bartnoff, but the judge ordered him to be ready for trial in Mr. Hill's case on November 19, 2007. While the precise timing is unclear, at some point between the initial trial date and November 19, 2007, Respondent was advised by Judge Bartnoff's court that the November 19 date before Judge Cushenberry was a status conference. Respondent never verified that information with Judge Cushenberry's court, notwithstanding that the judge clearly set November 19 as a trial date.

On November 19, 2007, Respondent checked the conflict list sheet in Judge Cushenberry's court and appeared for trial in Judge Bartnoff's court. Aware that Respondent had other matters, Judge Bartnoff asked Respondent about them. It is clear from the transcript of that proceeding that Judge Bartnoff was under the impression that the proceeding in Judge Cushenberry's court was a status conference to set the date for trial, and Respondent did not correct Judge Bartnoff's misimpression. Subsequently, Judge Cushenberry's court called Judge Bartnoff's court and advised Judge Bartnoff that Respondent was expected in Judge Cushenberry's court for Mr. Hill's trial.

When Respondent appeared in Judge Cushenberry's court, he told the judge he was not prepared,[2] but that his client

---

he went to trial the following week. Mr. Hill's parents "said they didn't realize that." Nor, apparently, did they realize that there *was an unindicted charge for which the vic-*tim had identified Mr. Hill in a photo array, and that one or both co-defendants would be testifying against their son.

**2.** As was the case with Mr. Williams, Respondent's preparation for the trial was minimal.

As of the day of trial, November 15, 2007, he had not, among other things: (a) hired an investigator, attempted to interview witnesses, or visited the scene of the crime; (b) investigated or prepared for the testimony of Mr. Hill's co-defendants when Respondent knew, or should have known, that at least one of the co-defendants was cooperating and would testify against Mr. Hill at trial; (c) requested and/or obtained discovery from the govern-

would plead to the charged offense. Respondent had not discussed the plea with his client and explained that pleading to the charge foreclosed Mr. Hill's opportunity to plead to charges eligible for reduced sentencing under the Youth Rehabilitation Act. Mr. Floyd reiterated that the plea offer covered only the charged and one of the uncharged offenses. Ultimately, in response to the judge's questioning, Mr. Hill requested that a new attorney be appointed. The judge arranged for new counsel and advised Respondent that he was referring the matter to Bar Counsel.

The Board found substantial evidence to support the Hearing Committee's findings that Respondent violated Rules 1.1(a) (failing to provide competent representation), 1.1(b) (failing to serve a client with the skill and care commensurate with that generally afforded to clients by other lawyers in similar matters), 1.3(a) (failing to represent a client zealously and diligently), 1.3(b)(1) (intentionally failing to seek the lawful objectives of a client), 3.3(a)(1) (knowingly making a false statement of material fact or law to a tribunal), 3.4(c) (knowingly disobeying an obligation under the rules of a tribunal), 8.4(c) (engaging in conduct involving dishonesty), and 8.4(d) (engaging in conduct that seriously interferes with the administration of justice).

## II. Standard of Review

"In a disciplinary case, this court accepts the Board's findings of fact unless they are unsupported by substantial evidence of record. This court reviews the Board's legal conclusions *de novo* ... The Board, in turn, is required to accept the factual findings of the hearing committee that are supported by substantial evidence in the record, viewed in its entirety. However, the Board owes no deference to the hearing committee's determination of ultimate facts, which are really conclusions of law." *In re Shariati*, 31 A.3d 81, 86 (D.C. 2011) (quoting *In re White*, 11 A.3d 1226, 1228 (D.C.2011)) (quotation marks omitted). *See also* D.C. Bar R. XI, § 9(g)-(h) (2006).

## III. Discussion

Respondent does not take exception to the Board's conclusions of law in the Carthens or Hermann matters. Respondent takes exception to the Board's conclusions of law in the Williams, McAllister, Montgomery, and Hill matters.

## A. The Williams Matter

Respondent claims, essentially, that his failure to investigate or prepare for Mr. Williams' trial and his failure to visit the crime scene or file motions to suppress were the product of tactical judgments.[3]

---

ment; (d) subpoenaed or otherwise secured the presence of a fingerprint expert to testify at Mr. Hill's trial, even though the only useable prints recovered from the stolen car belonged to the co-defendants; (e) filed any pretrial motions; or (f) filed a motion to sever the co-defendants so as to permit a motion to exclude the co-defendants' out-of-court statements that inculpated Mr. Hill.

**3.** Respondent rehashes, in some instances verbatim, the arguments he made to the Board that: "[t]here was no evidence to support the finding that the facts of Mr. Williams' case required or mandated Respondent to visit the crime scene, file pretrial motions, pre-

pares [sic] an opening statement, or cross-examination of witnesses"; and that Bar Counsel had to "prove that there was no reasonable professional judgment that supported Respondent's failure to investigate and interview potential witnesses and [had to prove] that a proper investigation of this case would have brought out substantial weaknesses in the government's case." Respondent maintains that "Mr. Williams's case did not require him to do more than review the police reports and have discussions with his client because he knew the facts of the case as presented by the client."

As the Board pointed out, however, tactical judgments must be informed. *In re Stanton*, 470 A.2d 272 (D.C.1983); *Monroe v. United States*, 389 A.2d 811, 817 (D.C. 1978). Here, the record supports the Board's conclusion that Respondent's decisions were not informed. Among other things, the Board highlighted: Mr. Williams' testimony that he had spoken only generally with Respondent about the charges; Respondent's statement to Judge Retchin that he had not had a chance to consult with his client; and Mr. Williams' testimony that even though he had given Respondent the names of potential witnesses, he was under the impression that Respondent had not conducted any investigation.

■ The Board also cited the testimony of Jonathan Zucker, a criminal law expert, who detailed the type of investigation and trial preparation he would expect to see in a case such as that of Mr. Williams. The Board found that the Hearing Committee properly accepted Mr. Zucker's testimony as to the steps needed to mount an adequate defense. Respondent takes exception to the Hearing Committee and Board's reliance on Mr. Zucker's testimony, asserting that Mr. Zucker opined "without regard or knowledge of the specific facts of Mr. Williams' case." His assertion is wrong. Mr. Zucker reviewed Respondent's files, the court files, and court transcripts, and testified to the factual basis and procedural posture of Mr. Williams' matter. Respondent has not provided a meaningful basis for concluding that the Hearing Committee and Board erred by crediting and accepting Mr. Zucker's testimony.

■ Respondent next claims that he did not knowingly make any false or fraudulent statements. Under Rule 3.3(a)(1), a lawyer shall not knowingly "[m]ake a false statement of fact or law to a tribunal." Under Rule 8.4(c), a lawyer shall not, "[e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The term "dishonesty" includes not only fraudulent, deceitful or misrepresentative conduct, but also "conduct evincing a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness." *In re Shorter*, 570 A.2d 760, 767–68 (D.C.1990) (per curiam) (citing *Tucker v. Lower*, 200 Kan. 1, 4, 434 P.2d 320, 324 (1967) (quotation marks omitted)).

■ The record adequately supports the Board's conclusion that Respondent knowingly made a false statement. Respondent told Judge Retchin that he was "in trial" or "completing a trial" with Judge Ross, meaning that he was physically unavailable. The statement was false.[4] Respondent maintains that, in context, his statement should not have been construed to suggest that he was unavailable, but should have been construed to suggest that he was not ready for trial. However, the Board reviewed the transcript of the exchange with Judge Retchin and determined that "[t]he transcript of the proceeding ... shows that Respondent knew that Judge Retchin was asking about his availability for trial, not his readiness for the start of trial." The Board found that "[i]t was only when pressed by Judge Retchin that Respondent acknowledged the true status of the case before Judge Ross. He then asserted that he was unprepared to go to trial." Judge Retchin stated on the record that "she thought Re-

---

4. At the time Respondent told Judge Retchin that he was "in trial" or "completing a trial" with Judge Ross, jury deliberations were taking place. The Board found that the term "in trial" means an attorney is physically unavailable, and that, in Superior Court, attorneys are not physically unavailable when jury deliberations are taking place.

spondent was not being honest with her and was instead attempting to postpone or delay the trial." The record supports the Board's conclusion that Respondent made a false statement, and that he did so knowingly.

■ Respondent also takes exception to the Board's conclusion that he violated Rule 1.16 by failing to return unearned fees. Respondent's argument is facially flawed. Respondent notes that Mr. Williams retained him for a flat fee of $2,500 and suggests that he earned a portion of the fee because he entered an appearance in Mr. Williams' case on November 2, 2003, and because he had "several telephone conversations" with Mr. Williams in December 2003. However, he does not suggest that he earned the entire flat fee or that he returned any portion of the fee. Thus, Respondent impliedly concedes that he failed to return some unearned fees in violation of Rule 1.16(d).[5]

Respondent seems to suggest that he is entitled to retain some portion of the flat fee. However, assuming *arguendo* that we accept the premise that Respondent earned a portion of the fee, he has not articulated a basis for determining what portion that is, and we decline to articulate one *sua sponte*.

## B. The McAllister Matter

Respondent maintains that under the explicit language of the retainer agreement, the scope of his representation was limited to providing advice and did not include the filing of motions.[6] In accordance with this limited scope, Respondent

contends that, after providing advice, the representation and his professional obligations ended. Thus, he maintains that he did not abandon Mr. McAllister, and that it was unreasonable for Mr. McAllister to believe that a motion for reduction of sentence would be filed. In support of this position, Respondent cites Rule 1.2 and comments 4 and 5 to Rule 1.2, which all permit a lawyer to limit the scope of services provided by agreement. He also cites comment 4 to Rule 1.3, which permits a lawyer to serve as an advocate or an advisor.

■ Respondent overstates the significance of the retainer agreement and understates his professional obligations. We have observed that "an attorney's ethical duties to a client arise not from any contract but from the establishment of a fiduciary relationship between attorney and client." *In re Ryan*, 670 A.2d 375, 379 (D.C.1996). Thus, while Rule 1.2 permits a lawyer to limit the scope of services provided by agreement, these sorts of arrangements "cannot sweep away the applicable rules of professional conduct." D.C. Bar Legal Ethics Comm. Op. 330 (2004). To the extent a lawyer limits the scope of representation, "it is essential that clients clearly understand the division of responsibilities under a limited representation agreement." *Id.* The record here shows that Mr. McAllister did not understand the division of responsibilities set forth in the retainer agreement.

■ The record here also shows that Respondent knew, as of his first meeting with Mr. McAllister, that Mr. McAllister's

---

5.  *See In re Hallmark*, 831 A.2d 366, 372 (D.C. 2003) ("Even assuming that respondent was entitled to withhold a portion of the retainer fee in compensation for appearing before the court, this does not justify the withholding of the entire fee amount as it is clear that she performed only part of the work.").

6.  The retainer agreement provided that Respondent would "study and review [the case], and ... advise Andre McAllister ... on the best next course of action."

objective in hiring Respondent was to request a reduction in sentence. Yet, Respondent took no action to advance his client's stated objective. He did not communicate adequately with his client—before, during, or "after" the representation—and he did not protect his client's interests upon his unilateral withdrawal from the representation.

## C. The Montgomery Matter

As to the Montgomery matter, Respondent argues that when Ms. Ginwright advised him that Mr. Montgomery's father "was going to get another lawyer," he was discharged. Respondent argues that because he was discharged, he was required to withdraw from the representation under Rule 1.16(a)(3).

■ As above, Respondent understates his professional obligations. Respondent is correct that, under Rule 1.16(a)(3), a lawyer "shall withdraw from the representation of a client if . . . discharged." However, Rule 1.16(a)(3) must be read in conjunction with Rule 1.16(d), which provides that, "[i]n connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as . . . allowing time for employment of other counsel."

After Ms. Ginwright told Respondent that Mr. Montgomery was going to get another lawyer, Respondent took no steps to protect Mr. Montgomery's interests. Respondent never checked to see if another attorney had entered an appearance, he never filed a motion to withdraw as counsel,[7] and, as counsel of record, he failed to

appear at status conferences held on September 22 and 29, 2006.

Respondent also failed to communicate the termination to Mr. Montgomery. Mr. Montgomery attempted to contact Respondent by telephone, but Respondent did not respond to his calls. At some point prior to the September 29, 2006, status conference, Mr. Montgomery and Ms. Ginwright telephoned Respondent in a three-way conference call. When Mr. Montgomery asked Respondent why he had not appeared in court, Respondent did not provide an explanation. At that point, Respondent was on notice that Mr. Montgomery continued to view him as his counsel and his failure to take any steps to protect Mr. Montgomery's interests or formally withdraw made his abandonment knowing. As to prejudice, the record shows that Mr. Montgomery was imprisoned unnecessarily for a prolonged period of time. The Board noted that when Mr. Montgomery "finally obtained diligent counsel, the charges against him were dismissed."

## D. The Hill Matter

■ As in the Williams matter, Respondent maintains that his failure to investigate, to visit the scene, to interview witnesses, and to prepare for trial were products of tactical judgment. Respondent maintains that "he knew that Mr. Hill would plead guilty," and that "there was no evidence presented that an investigation was necessary and that an investigation would have revealed any evidence inconsistent with the client's narration of events to Respondent." For the reasons stated above in reference to the Williams

---

7. At the hearing, Respondent testified that he was concerned that if he filed a motion to withdraw, the court would not grant the motion and Respondent would be obligated to continue his representation of Mr. Montgomery. Unless Respondent was concerned that the court would not grant the motion *despite Mr. Montgomery's wishes,* such concern seems inconsistent with the proposition that Respondent had been discharged.

matter, we find no merit to Respondent's position.

■ Respondent also claims that he did not make a false statement or conceal any material information from Judge Bartnoff regarding his obligation to appear before Judge Cushenberry for trial in the Hill matter on the morning of November 19, 2007. Respondent maintains that he reasonably relied on Judge Bartnoff's incorrect statement that the trial date in the Hill matter had been converted to a status conference.

The record contains substantial evidence, however, that Respondent intentionally failed to correct Judge Bartnoff's misimpression. The Board found that Respondent "could not have reasonably believed that Judge Cushenberry would have converted the November 19, 2007, proceeding into a status hearing without advising him directly." In fact, "Judge Cushenberry had told [Respondent] that he would be held in contempt if he failed to appear." When Judge Bartnoff asked Respondent about his other matter, she was "seeking to verify the nature of Respondent's obligation to Judge Cushenberry." Respondent allowed Judge Bartnoff to proceed with a misimpression, rather than correct it. We are satisfied that there was substantial evidence to support the Board's finding that Respondent's failure to correct Judge Bartnoff's misimpression was an intentional act of dishonesty or fraud. *See In re Shorter*, 570 A.2d at 767 n. 12 ("[f]raud is a generic term which embraces all the multifarious means ... resorted to by one individual to gain an advantage over another by false suggestions *or by suppression of the truth* ") (emphasis add-

ed) (quotation marks and citation omitted).[8]

## IV. Sanction

■ The Board recommends that we suspend Respondent for the maximum period of three years, *see* D.C. Bar R. XI, § 3(a)(2), and that as a condition of reinstatement, Respondent should be required to demonstrate his fitness to practice law and pay restitution to Mr. Williams in the amount of $2,500 plus interest at the legal rate. We will adopt the recommended disposition of the Board, " 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.' " *In re Cleaver–Bascombe*, 986 A.2d 1191, 1194 (D.C.2010) (per curiam) (quoting D.C. Bar R. XI, § 9(h)(1)). "So long as the Board's sanction recommendation falls within the wide range of acceptable outcomes, it comes to us with a strong presumption in favor of its imposition." *In re Steele*, 868 A.2d 146, 153 (D.C.2005) (citing *In re Austin*, 858 A.2d 969, 975 (D.C.2004)); *accord, In re White*, 11 A.3d at 1233. "In deciding whether to adopt the Board's recommendation, we must examine the 'nature of the violation, aggravating and mitigating circumstances, the absence or presence of prior disciplinary sanctions, the moral fitness of the attorney, and the need to protect the legal profession, the courts, and the public.' " *Steele*, 868 A.2d at 153 (quoting *In re McLain*, 671 A.2d 951, 954 (D.C. 1996) (quotation marks omitted)). Moreover, "when considered in combination, instances of misconduct charged in separate matters may 'justify a lengthy period of suspension,' even though when '[c]onsidered individually, and in isolation, these instances of misconduct might be deemed

---

8. We are also satisfied that Respondent's failure to correct Judge Bartnoff amounted to a "false material statement." *See* Comment 2 to Rule 3.3(a)(1) ("There may be circum-

stances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.").

less serious' than the lengthy suspension indicates." *In re Scott*, 19 A.3d 774, 782 (D.C.2011) (quoting *In re Ditton*, 980 A.2d 1170, 1173 (D.C.2009)).

■■■ Here, Respondent's misconduct was extensive, resulting in 40 violations of 14 Rules in six matters. Respondent exhibited a consistent pattern of neglect that in some instances prejudiced his clients, and in nearly every instance prejudiced the administration of justice. Respondent's neglect delayed trials and inconvenienced witnesses and jury panels. In two instances, in an attempt to conceal his lack of preparation, Respondent misrepresented his availability for trial. But perhaps most troubling, as the Board recognized, is Respondent's "cavalier attitude" and failure to acknowledge the wrongful conduct, which we also factor into our evaluation of an appropriate sanction. *See Cleaver-Bascombe*, 986 A.2d at 1207. In light of Respondent's "misguided view of his obligations towards his clients and his responsibilities under the Rules," we conclude easily that Respondent must be required to prove his fitness to practice before being reinstated, and we turn our attention to the duration of Respondent's suspension.

The Board concluded that the violations in this case are akin to those in *In re Scott*, *supra*, a consolidated original and reciprocal case in which, in addition to imposing a fitness requirement, we suspended the respondent for the maximum period of three years. There, in the reciprocal case, the North Carolina State Bar found that respondent had violated several rules of professional conduct in connection with three matters.[9] 19 A.3d at 777–78. In the origi-

nal case, Respondent failed to acknowledge the North Carolina matters in her application to become a member of the District of Columbia Bar, and in related correspondence. *Id.* at 779. The Board here observed that "Respondent's dishonesty is less egregious than [that of the respondent] in *Scott*, but his pattern of neglect is more extensive, and he very clearly has a misguided view of his obligations towards his clients and his responsibilities under the Rules." The Board also discussed *In re Steele*, *supra*, another relatively recent case in which we suspended the respondent for the maximum period of three years and imposed a fitness requirement. There, Respondent exhibited a pattern of neglect in five matters, and also committed two dishonest acts: he lied to a client about filing a submission with the court, and he fabricated a subpoena that purported to compel his appearance in one court as a justification for failing to appear in another court. *Id.* at 150–51, 153.

■■■ We have repeatedly recognized that comparisons between disciplinary cases are often difficult, *e.g.*, *Scott*, 19 A.3d at 783; *Steele*, 868 A.2d at 154; *In re Ukwu*, 926 A.2d 1106, 1120 (D.C.2007), especially where, as here, the violations are numerous and varied, and they span multiple matters. We recognize that cases involving a pattern of neglect and instances of dishonesty do not invariably result in a suspension for the maximum period of three years. *See, e.g.*, *Ukwu*, 926 A.2d at 1120 (two year suspension). Nevertheless, we are satisfied that in this case, the Board's recommended sanction "falls within the wide range of acceptable outcomes." *Steele*, 868 A.2d at 153.

9. Each of the North Carolina matters involved the same general pattern: a client retained respondent to represent him or her in a family matter, paid respondent's legal fees, and then failed to hear from respondent again. *Id.* at 778. In each of the matters, the client filed a fee dispute petition that, unanswered, ripened into a disciplinary grievance. *Id.*

Respondent's reliance on *In re Pullings*, 724 A.2d 600 (D.C.1999), does not persuade us otherwise. In *Pullings*, we adopted the Board's recommended 60 day suspension based on violations for failure to surrender a client's papers, failure to perfect an appeal, and failure to provide a written statement of the basis of a fee. *Pullings* is readily distinguishable from the case at hand as it did not involve any sort of dishonesty, and it did not involve the sort of pervasive incompetence that characterizes Respondent's conduct here.

### V. Conclusion

In light of the foregoing, Richard A. Samad is suspended from practice in the District of Columbia for a period of three years.[10] As a condition of reinstatement, Mr. Samad must establish his fitness to practice law pursuant to D.C. Bar R. XI, § 16, and make restitution to his client, Duane Williams, in the amount of $2,500 plus interest at the legal rate of 6% per annum from the date when Williams paid the fee.

*So ordered.*

---

10. Although Respondent was suspended by the court on an interim basis pursuant to D.C. Bar R. XI, § 3(c)(1), on April 12, 2011, he has yet to file the affidavit required by the court's order and D.C. Bar R. XI, § 14(g). Thus, for purposes of reinstatement, Respondent's suspension shall be deemed to run from the date on which he files an affidavit compliant with his obligations under § 14(g).