*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-BG-0589

IN RE ALVIN S. BROWN, RESPONDENT.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 263681)

On Report and Recommendation of the
Board on Professional Responsibility
(Disciplinary Docket No. 2017-D242)
(Board Docket No. 19-BD-032)

(Submitted February 10, 2022                    Decided March 7, 2024)

*Alvin S. Brown*, pro se.

*Myles V. Lynk*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for appellee.

Before BECKWITH, EASTERLY, and DEAHL, *Associate Judges*.

BECKWITH, *Associate Judge*:    The Board on Professional Responsibility recommends that respondent Alvin S. Brown be suspended for sixty days from the practice of law, and that as a condition of reinstatement, he be required to demonstrate his fitness and pay restitution.    The Board makes these recommendations after determining that Mr. Brown violated eight separate rules of

professional conduct when he failed to provide promised legal services to his client, failed to sufficiently communicate with his client, charged his client fees for services not provided, and failed to return unearned legal fees. We hold that the record supports the Board's conclusions and we adopt the Board's recommendations.

## I.

The evidence before the Ad Hoc Hearing Committee showed that Mr. Brown has been a member of the District of Columbia Bar since 1979. Although Mr. Brown was not a member of the Bar of New York, he has been allowed to represent taxpayers in proceedings before the New York Department of Taxation and Finance (DTF) because he met certain other qualifications.[1] When Ali Pascal Bahri came to Mr. Brown with a New York tax-liability problem, Mr. Brown agreed to represent him.

Specifically, Mr. Bahri's tax issues arose from sales-tax liability he accrued in 2003, when he owned a 51% majority of Purecells, Inc. Under New York tax law, if a business does not pay its sales taxes, then certain individuals—including majority owners—can be held personally liable, even if the corporation goes into

---

[1] The record refers to the Department as the "Department of Taxation and Revenue." We assume this is an error; there is no New York Department of Taxation and Revenue.

bankruptcy. In 2003, Purecells owed, but did not pay, approximately $14,800 in sales taxes to New York. At the same time, Mr. Bahri was experiencing several personal and business challenges. After getting divorced, he chose not to renew his green card, closed Purecells, and returned to his home country of France. Mr. Bahri did not learn about his tax liability until he returned to the United States in 2011 and the state began to garnish his wages. Mr. Bahri returned to France until 2015, when he became eligible for a U.S. green card. He then came back to the United States and attempted, unsuccessfully, to resolve his state sales-tax liability. By February 2016, when Mr. Bahri sought Mr. Brown's legal assistance, his tax liability had ballooned to more than $68,000.

As his lawyer, Mr. Brown could have pursued two options to minimize Mr. Bahri's tax liability. Under New York law, taxpayers may seek an Offer in Compromise (OIC) by submitting to the Office of Compromise financial statements and other documents showing a financial inability to pay their taxes. Alternatively, individuals who have a good reason for failing to pay their taxes, like an "unavoidable absence from [their] usual place of business," may seek an abatement from whichever office initiated the tax bill. N.Y. Comp. Codes R. & Regs. tit. 20 § 2392.1(d). Unlike taxpayers seeking an OIC, taxpayers seeking an abatement need not show a financial hardship.

Mr. Brown titled his engagement agreement with Mr. Bahri "Engagement Agreement for NY State Sales Tax Offer-in-Compromise Settlement Agreement." The body of the agreement included language requiring Mr. Bahri to provide either evidence that the tax liability was "unfair and/or unjustified to some extent" or that Mr. Bahri was suffering "economic hardship." Taken together, the title and the body of the agreement suggest that Mr. Brown offered to pursue either an OIC or an abatement for Mr. Bahri, though it was unclear which one.

Mr. Bahri accepted the engagement agreement and paid Mr. Brown a $4,000 flat fee. In March 2016, Mr. Bahri provided Mr. Brown with several documents and stated by email, "I do not dispute the sales tax amount due but the penalties and interests [I] do dispute."

Two months later, Mr. Bahri emailed Mr. Brown to "touch base." Mr. Brown responded: "Got a call from White. They are waiting to hear from IRS Counsel but she expects it soon." This made little sense. Neither the IRS nor a person named "White" was involved in the matter and Mr. Bahri owed taxes to the state of New York, not the IRS. In reality, Mr. Brown had not yet contacted anyone or filed anything to assist Mr. Bahri, so there was nothing he could be waiting on.

When Mr. Bahri followed up two months later and asked for an update, Mr. Brown responded that "there is nothing we can do. My guess is that the office

is busy." Mr. Bahri asked for clarification, but Mr. Brown did not respond. Mr. Bahri followed up once more, and once more received no substantive update on his matter.

Finally, on August 9, 2016, Mr. Brown informed Mr. Bahri that he had "a legal memorandum that is mostly complete." When asked during disciplinary proceedings about the alleged legal memorandum, Mr. Brown produced a cover letter with one-page legal argument. In that same August 2016 email, Mr. Brown also asked Mr. Bahri for a number of documents that he claimed he needed, despite having received them several months earlier. Mr. Bahri resent the files, including additional copies of his green cards to show that he was out of the country until 2015. Mr. Bahri also reiterated that he did "not dispute the princip[al] amt of sales tax owed[.] I am disputing all of the penalties and interest imposed."

When Mr. Bahri followed up the following month asking for an update on his case, Mr. Brown said that he would "check on that." Mr. Brown did not report that he still had not filed anything on Mr. Bahri's behalf or that he had not yet spoken with anyone at DTF about Mr. Bahri's matter.

In October 2016, Mr. Brown took the first official step in Mr. Bahri's matter. He filed an OIC, stating that the offer was "based on no liability for the sales tax amount and years in the attached statement" and that Mr. Bahri would be willing to

make a $1,000 payment. These two statements were inconsistent with Mr. Bahri's repeated insistence that he was willing to pay the initial sales taxes owed and sought to refute only the interest and penalties he had accrued. Mr. Brown also incorrectly stated that "Bahri is a naturalized citizen of the U.S. who lived abroad when the sales tax liability was incurred." Mr. Bahri was not a naturalized citizen and was not living abroad when the initial sales tax liability was incurred.

That same month, Mr. Bahri emailed Mr. Brown asking for an immediate update, warning that he was "close to filing a complaint with the discipline and grievance committee" and demanding a full refund if Mr. Bahri was not able to competently handle the case. Mr. Brown responded immediately and informed Mr. Bahri that he had filed with New York but was missing proof of what Mr. Bahri was "doing abroad prior to 2004. Where were you living and/or working." He also sent Mr. Bahri, for the first time, the document he had filed with DTF. Mr. Bahri responded and explained again that he was in the United States prior to 2004, that he was out of the United States from 2004 to 2015, and that he was seeking relief only from the penalties and interest, not the original sales tax.

In response, Mr. Brown asked where Mr. Bahri was from 2001 to 2003 and stated that if Mr. Bahri could show that he was working full time in a foreign country at that time, then he would have "no responsibility" for the sales tax. Mr. Brown

concluded his email with "I do not know why this point is not clear to you." In a follow-up email, Mr. Brown said that Mr. Bahri would need to provide "[r]ent receipts, wage documentation, car rental, passport—that kind of data."

Meanwhile, DTF was dealing with Mr. Brown's filings. It sent Mr. Brown a letter explaining that the OIC was incomplete and giving Mr. Brown until November 15, 2016, to supply the required financial information. There is no evidence that Mr. Brown ever informed Mr. Bahri of this letter, asked for the required documents, or responded to DTF.[2] In fact, after his October 2016 email correspondence with Mr. Bahri, Mr. Brown did not communicate with his client again until January 2019. In this time, Mr. Bahri twice asked Mr. Brown for an update about the status of his case but received no reply.

Finally, in January 2019, Mr. Brown responded after Mr. Bahri asked for a refund for his legal fees. Mr. Brown wrote "[o]utside of the fact that NY State denied my application for abatement, I could find no other pathway to get that abatement."

---

[2] According to the hearing committee's report, "[a]t the hearing, Respondent claims he told Mr. Bahri about the DTF's 'return' of the Offer in Compromise, but there is no documented support for this assertion, Mr. Bahri denies it, and Respondent admits that he did not tell Mr. Bahri that DTF was seeking additional information." The hearing committee therefore found "unreliable" Mr. Brown's "recollection and testimony about whether he told his client anything at all about the New York DTF's response to the Offer in Compromise."

But Mr. Brown had not sought an abatement for Mr. Bahri; he had filed an OIC. And New York had not rejected his application; it had asked for more information, which Mr. Brown failed to seek from Mr. Bahri and failed to provide to the state.

At the time of Mr. Brown's hearing before the hearing committee, Mr. Bahri had not been refunded any of his legal fees, had been unable to resolve his tax liabilities, and had continued to struggle to manage his finances. His tax debt to the state was still growing, which prevented him from opening a checking account, building a credit history, or carrying out financial transactions in anything other than cash.

The hearing committee found that Mr. Brown violated

> Rules 1.1(a) (failure to provide competent representation); 1.3(a) (failure to represent a client with zeal and diligence); 1.3(b)(1) (intentional failure to seek lawful objectives of a client); 1.3(c) (failure to represent a client with reasonable promptness); 1.4(a) (failure to keep client reasonably informed); 1.5(a) (charging unreasonable fee); 1.15(e) (failure to treat advance fee as property of client); and 1.16(d) (failure to take reasonable steps to protect client's interests in event of termination, and refund unearned fees).

It recommended a sixty-day suspension from the practice of law and required as a condition of reinstatement that Mr. Brown: "(a) make restitution to his client Mr. Bahri in the amount of $4,000 plus interest calculated at the legal rate (6%)

running from June 13, 2016 to the date of payment; and (b) make a demonstration of fitness before being readmitted to the practice of law."

The Board adopted the hearing committee's recommendations, "finding that Disciplinary Counsel has proven each rule violation by clear and convincing evidence, and agr[eeing] that Respondent should be suspended for sixty days with a requirement that he show fitness and pay restitution before being reinstated."

## II.

This court must "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record." D.C. Bar Rule XI, § 9(h)(1). "The Board, in turn, is required to accept the factual findings of the hearing committee that are supported by substantial evidence in the record, viewed in its entirety." *In re Samad*, 51 A.3d 486, 495 (2012) (per curiam) (quoting *In re Shariati*, 31 A.3d 81, 86 (D.C. 2011) (per curiam)). We review the Board's legal conclusions de novo. *Id.*

### A.     Rule 1.1(a)

Rule 1.1(a) mandates that "[a] lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." A

lawyer violates Rule 1.1(a) if he makes "an error that prejudices or could have prejudiced a client and the error was caused by a lack of competence." *In re Yelverton*, 105 A.3d 413, 422 (D.C. 2014) (quoting *In re Evans*, 902 A.2d 56, 70 (D.C. 2006) (per curiam)).

The Board found that Mr. Brown "pursued an avenue of relief [for Mr. Bahri] that was not available [to Mr. Bahri] in New York and did not explore any other options after learning that his original offer would not be considered." Whether a misguided strategic decision or a failure to conduct sufficient research, Mr. Brown's actions did not, in the Board's view, constitute competent representation, "and his failure to provide [competent representation] prejudiced Mr. Bahri's interests by delaying resolution of his tax liability while penalties and interest continued to accumulate." The Board therefore concluded that Disciplinary Counsel had satisfied its requirement for proving a 1.1(a) Rule violation.

Mr. Brown disputes the Board's determination and argues that he was competent, despite what he admits were his failures to complete an OIC for Mr. Bahri and to begin the process of seeking an abatement for Mr. Bahri.

First, as to the OIC, Mr. Brown argues that he was not required to seek such relief for Mr. Bahri under the engagement agreement. According to Mr. Brown, the engagement agreement laid out two avenues for relief—abatement or OIC. Because

Mr. Bahri never provided the required economic documents to support a claim of economic hardship required for an OIC, he implicitly rejected that avenue for relief. Mr. Brown further argues that—even if he were required to complete an OIC under the engagement agreement—Mr. Bahri was not prejudiced by Mr. Brown's failure to do so. According to Mr. Brown, even if those documents had been submitted to New York, the state would have denied the request because it would not have been in the state's "best interest" to settle tax debt "accrued from stolen funds."

Disciplinary Counsel counters that the engagement agreement was unclear as to whether Mr. Brown agreed to seek an OIC or an abatement for Mr. Bahri and that Mr. Brown failed to seek economic data from Mr. Bahri. Had Mr. Brown "actually sought to ascertain Mr. Bahri's financial condition, he might well have found support for an Offer in Compromise."

As an initial matter, this court has held "that any supposed failure of a client to fulfill a retainer agreement is no defense to a disciplinary charge against an attorney." *In re Ryan*, 670 A.2d 375, 380 (D.C. 1996). It is a "fundamental principle that an attorney's ethical duties to a client arise not from any contract but from the establishment of a fiduciary relationship between attorney and client." *Id.* at 379. Mr. Brown cannot sidestep his responsibility to provide competent representation simply because Mr. Bahri did not immediately provide economic documents. This

is especially true here, where Mr. Brown made a cursory reference to economic-hardship documents in the initial engagement agreement and never followed up with Mr. Bahri to discuss those documents, even after the state of New York explicitly requested them. "To the extent a lawyer limits the scope of representation"—such as when a lawyer's offer to perform a service for a client is contingent on the client providing specific documents—"it is essential that [the client] clearly understand the division of responsibilities under a limited representation agreement." *In re Samad*, 51 A.3d at 497 (quoting *In re Ryan*, 670 A.2d at 379). There is no indication here that Mr. Bahri understood the alleged limits on the scope of Mr. Brown's representation or that Mr. Brown did anything to ensure Mr. Bahri's understanding.

We find equally unpersuasive Mr. Brown's argument that Mr. Bahri was not prejudiced by Mr. Brown's failure to complete the OIC. First, as the Board found, Mr. Bahri was prejudiced by Mr. Brown's lengthy delay in representing Mr. Bahri. In the several months that it took for Mr. Brown to submit an OIC, and in the time after New York responded to Mr. Brown but Mr. Brown failed to communicate with Mr. Bahri, Mr. Bahri's tax liability continued to compound. And we are not persuaded by Mr. Brown's contention that following up on the OIC would have been futile. His conclusion that Mr. Bahri could not show economic hardship is based on nothing more than a trip Mr. Bahri took to China. Mr. Brown cites no New York caselaw showing that the ability to pay for international travel—or any other alleged

luxury—precludes a taxpayer from showing economic hardship. And he cites no authority to support his assumption that it would be against New York's best interest to grant an OIC.

As to his failure to even begin the process of requesting an abatement for Mr. Bahri, Mr. Brown states that there was no Rule 1.1(a) violation because Mr. Brown's failure did not prejudice Mr. Bahri. According to Mr. Brown, Mr. Bahri could not satisfy the "reasonable cause" requirement for New York's abatement process because Mr. Bahri's statement that he was "not aware" of his tax liability was "self-serving hearsay." He further argued that being unaware of a tax liability does not qualify as reasonable cause under New York tax law.

As Disciplinary Counsel's brief accurately observes, "[p]resumably every taxpayer's explanation is self-serving to some extent." Besides, Mr. Brown does not point to any New York precedent suggesting that a taxpayer fails to satisfy the "reasonable cause" requirement if he is unaware of his tax liability because he is out of the country. Even if Mr. Brown's decision not to pursue an abatement for Mr. Bahri was a tactical judgment, that does not excuse his behavior. "[T]actical judgments must be informed." *In re Samad*, 51 A.3d at 496. Mr. Brown's decisions were not informed by a competent understanding of New York law.

## B.     Rule 1.3

The Board agreed with the hearing committee that Mr. Brown violated Rules 1.3(a), 1.3(b)(1), and 1.3(c) "because he failed to take action on Mr. Bahri's tax matter for several months (while telling Mr. Bahri that a request for relief was pending), and he ignored the DTF's request for additional information because he concluded that Mr. Bahri's tax relief request was futile, without communicating that conclusion to Mr. Bahri."

Rule 1.3(a) requires a lawyer to "represent a client zealously and diligently within the bounds of the law." Mr. Brown insists that he zealously and diligently represented Mr. Bahri by spending eight months searching for an abatement tax form. That argument is facially absurd. As Disciplinary Counsel correctly points out, "[a] zealous and diligent advocate would have contacted the State agency or an experienced New York tax practitioner to find out how to file for an abatement." Mr. Brown argues that such efforts would have been futile because the tax form he sought does not exist. Mr. Brown's reasoning is circular—if effectively searching for a nonexistent tax form is futile, then ineffectively searching for it cannot also constitute zealous advocacy. Had Mr. Brown educated himself about abatement procedures in New York, he would have learned that an abatement tax form did not exist and would have known to shift his efforts to other avenues for addressing

Mr. Bahri's tax liability. He would have learned, for example, that the correct way to pursue a New York tax abatement is by calling the Selection and Resolution Center and explaining why Mr. Bahri had reasonable cause for missing his tax payments and why the tax penalty should be abated.

Rule 1.3(b)(1) directs that "[a] lawyer shall not intentionally . . . [f]ail to seek the lawful objectives of a client through reasonably available means permitted by law and the disciplinary rules." Here, Mr. Brown again argues that he could not seek any relief for Mr. Bahri because, according to him, Mr. Bahri did not suffer economic hardship and did not have reasonable cause for not paying his taxes. Again, Mr. Brown does not cite any precedent to support these legal conclusions. And, as Mr. Bahri's legal advocate, Mr. Brown had an obligation to "resolve in favor of [his] client doubts as to the bounds of the law." Comment 4 to Rule 1.3. Here, Mr. Brown did the opposite—without any case support, he resolved all legal doubts to the detriment of Mr. Bahri and then used these unsupported legal conclusions to justify neglecting his client. His stated assumption that Mr. Bahri could not satisfy the economic hardship requirement for an OIC is undermined by Mr. Brown's decision to submit an OIC on Mr. Bahri's behalf. Regardless of the likelihood of success, having submitted the OIC, Mr. Brown was obligated to follow through on the process. Comment 9 to Rule 1.3 ("Unless the relationship is terminated as provided in Rule 1.16, a lawyer should carry through to conclusion all matters

undertaken for a client.")

And under Rule 1.3(c), a lawyer must "act with reasonable promptness in representing a client." Because a lawyer's procrastination can cause real harm to a client—both practical and psychological—"[n]eglect of client matters is a serious violation of the obligation of diligence." Comment 8 to Rule 1.3. Mr. Brown says that he did not procrastinate in serving Mr. Bahri, but instead spent several months searching for a tax form that does not exist. And he argues that he had no obligation to respond to the state of New York because the engagement agreement did not require Offer-in-Compromise services. We reject both arguments for the reasons stated above: Spending eight months searching for a nonexistent tax form is facially unreasonable. And a lawyer may not avoid his fiduciary duty to a client by hiding behind a confusing and vague attorney-client agreement. Having started the Offer-in-Compromise process for Mr. Bahri, Mr. Brown had an obligation to complete it and keep Mr. Bahri informed of developments along the way.

We adopt the Board's recommended finding that Mr. Brown violated Rules 1.3(a), 1.3(b)(1), and 1.3(c).

### C.      Rule 1.4(a)

Rule 1.4(a) requires a lawyer to "keep a client reasonably informed about the

status of a matter and promptly comply with reasonable requests for information." "The guiding principle for evaluating conduct under Rule 1.4(a) 'is whether the lawyer fulfilled the client's reasonable . . . expectations for information.' To meet that expectation, a lawyer not only must respond to client inquiries but also must initiate communications to provide information when needed." *In re Hallmark*, 831 A.2d 366, 374 (D.C. 2003) (quoting *In re Schoeneman*, 777 A.2d 259, 264 (D.C. 2001)).

The Board found that Mr. Brown violated this rule because—despite Mr. Bahri's repeated request for an update on his matter—Mr. Brown "failed to tell Mr. Bahri that the DTF needed additional information." The emails that Mr. Brown did send to Mr. Bahri "were simply requests for irrelevant information."

Mr. Brown argues that any failure to keep Mr. Bahri reasonably informed was justified because Mr. Brown "had no updates with his ongoing 'tax research' looking for a NY form that could address a fixed and final liability." But again, Mr. Brown's eight-month effort to find a nonexistent tax form was not reasonable. His failure to zealously advocate for his client cannot justify failing to keep his client updated.

The purpose of Rule 1.4 is to ensure that clients "have sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued." Comment 1 to

Rule 1.4. A client can participate intelligently in decisions only if the client has accurate information about a lawyer's actions on his behalf. That did not happen here. Instead, many of Mr. Brown's emails to Mr. Bahri were misleading, if not outright dishonest. At the very least, Mr. Brown had a duty to respond to Mr. Bahri and inform him that he was still searching for a form. That would have given Mr. Bahri the chance to evaluate whether he should look elsewhere for more competent representation.

Mr. Brown also argues that the Board erred in finding that Mr. Brown failed to inform Mr. Bahri about the DTF's request for additional information. According to Mr. Brown, Mr. Bahri's "opinion to the contrary is the opinion of a thief who stole NY 2003 sales tax trust funds, did not hand trust fund money to a bankruptcy court upon the bankruptcy of Purecells, Inc., and spent the NY trust funds on personal expenses, including a trip to China." In effect, Mr. Brown is asking us to make our own credibility determinations. But "[a]ssessing the credibility of witnesses is a matter left to the factfinder, which in disciplinary proceedings is the hearing committee." *In re Hallmark*, 831 A.2d at 373. Here, the hearing committee found "unreliable [Mr. Brown's] recollection and testimony about whether he told his client anything at all about the New York DTF's response to the Offer in Compromise." Rejecting the committee's finding of fact requires more than unsupported character assassinations of a client. Mr. Brown does not cite any

evidence to support his assertion that he told Mr. Bahri about the DTF request for additional information.

### D. Rule 1.5(a)

Rule 1.5(a) requires that a lawyer's fee be "reasonable."

The Board concluded that Mr. Brown violated Rule 1.5(a) because he did not earn any of the $4,000 fee he charged Mr. Bahri. "[T]he only work Respondent completed—filing an Offer in Compromise—was both incorrect and not pursued." And once the DTF informed Mr. Brown of his mistake, he "did nothing to correct [it] or to otherwise advance his client's objectives." Because "[f]iling the Offer in Compromise provided no benefit or value to" Mr. Bahri, "it was the equivalent of doing nothing. As a result, Mr. Bahri did not receive the benefit of what he had contracted for when he provided the $4,000 flat fee."

Mr. Brown makes three arguments in response to the Board's conclusion. None is persuasive.

First, Mr. Brown argues that Mr. Bahri's matter was more complicated than he initially anticipated. But that does not change the analysis here; it is the risk a lawyer takes when choosing to charge clients a flat fee. *See In re Mance*, 980 A.2d 1196, 1204 (D.C. 2009) (explaining that flat fees eliminate "the uncertainty, anxiety

and surprise" to clients that is "often found with hourly rates, especially in protracted litigation") (internal quotations and citation omitted). While flat fees reward lawyers for efficiency, they also move the financial risk of protracted litigation or complicated legal matters from the client to the lawyer. *Id.* Having chosen to accept that risk, Mr. Brown cannot now transfer it back to Mr. Bahri.

Second, Mr. Brown argues that he did, in fact, earn the $4,000 fee because he spent many months diligently searching for the nonexistent tax form. As we have said above, spending eight months searching for a tax form is patently unreasonable and demonstrates a serious lack of competence. Mr. Bahri paid Mr. Brown $4,000 to endeavor to address his tax burden. Mr. Bahri received nothing of value for that fee—his taxes were not abated, he did not learn whether they could be abated, and he did not get a final conclusion from the state of New York. Instead, he waited for several years, assuming his lawyer was diligently working on his case, only for his tax interest to continue to increase.

Finally, Mr. Brown argues that the Board erred because it did not consider his engagement agreement with Mr. Bahri. But as we have said, regardless of his proposed interpretation of the engagement agreement, a lawyer cannot avoid his fiduciary duty to a client by pointing to a contract.

### E.      Rule 1.15(e)

Rule 1.15(e) states that "[a]dvances of unearned fees and unincurred costs shall be treated as property of the client . . . until earned or incurred unless the client gives informed consent to a different arrangement."  "Such a fee is earned 'only to the degree that the attorney actually performs the agreed-upon services.'  In sum, a flat fee is an advance of unearned fees because it is money paid up-front for legal services that are yet to be performed." *In re Mance*, 980 A.2d at 1202 (quoting Alec Rothrock, *The Forgotten Flat Fee; Whose Money is it and Where Should it be Deposited?*, 1 Fla. Coastal L.J. 293, 347 (1999)).

Mr. Brown does not dispute that he took each of Mr. Bahri's four $1,000 payments as his own income and never put them in a separate account.  But he argues that this did not violate Rule 1.15(e) because, according to him, he earned the fees on the day that they were paid.  Specifically, he states that he searched "exhaustively for a NY form that could be used to challenge a fixed and final liability," became an "expert on the definition of 'reasonable cause' under NY law," engaged in "e-mail communications with Bahri," and conducted an analysis of both the engagement agreements and "the futility of an OIC based on 'economic hardship.'"

Because we have already concluded that Mr. Brown never earned any of the fees he charged to Mr. Bahri, we reject the argument that the fees were earned on

the day they were paid.

### F.  Rule 1.16(d)

Rule 1.16(d) states, "[i]n connection with any termination of representation, a lawyer shall take timely steps to the extent reasonably practicable to protect a client's interests, such as . . . refunding any advance payment of fee or expense that has not been earned or incurred."

Mr. Brown argues that he did not violate Rule 1.16 because he earned the fees charged.  Again, like the Board, we reject this argument.  Mr. Brown did not earn any of the $4,000 charged and so he was required under Rule 1.16(d) to return the flat fee at the termination of the representation.

### III.

We generally adopt the Board's recommended penalty in bar discipline cases "as long as it 'falls within the wide range of acceptable outcomes.'"  *In re Krame*, 284 A.3d 745, 768 (D.C. 2022) (quoting *In re Ekekwe-Kauffman*, 210 A.3d 775, 797 (D.C. 2019) (per curiam)).  Here, the hearing committee recommended, and the Board agreed, that Mr. Brown be suspended for sixty days, be required to prove his

fitness before resuming the practice of law, and pay Mr. Bahri $4,000 plus interest[3] as restitution. We accept the Board's recommendation.

## A.    Suspension

"The discipline we impose should serve not only to maintain the integrity of the profession and to protect the public and the courts, but also to deter other attorneys from engaging in similar misconduct." *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013) (quoting *In re Scanio*, 919 A.2d 1137, 1144 (D.C. 2007)). In determining the appropriateness of a sanction, we consider several factors: "(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances." *Id.*

Mr. Brown's conduct was serious. As the Board correctly observed, "[n]ot only did he fail to carry out the terms of the representation, but he hid that fact from Mr. Bahri, giving him false reassurances that his matter was in progress and failing to inform him of the DTF's request for more information or his decision to abandon

---

[3] Interest is to be calculated at 6% per year, starting from June 13, 2016.

the case."

Mr. Brown's actions prejudiced Mr. Bahri. During the three years in which Mr. Bahri waited for Mr. Brown to seek to abate his tax payments, Mr. Bahri's tax debt continued to grow. Had Mr. Brown provided competent and ethical representation, Mr. Bahri either would have reduced his tax debt or would have received a definitive answer as to what he owed so that he could start chipping away at his debt immediately.

Mr. Brown demonstrated an alarming level of dishonesty when he led Mr. Bahri to believe that he was completing tasks he had not yet started.

Mr. Brown violated eight rules: Rule 1.1(a), 1.3(a), 1.3(b)(1), 1.3(c), 1.4(a), 1.5(a), 1.15(e), 1.16(d).

Mr. Brown has previously received an informal admonition for violating Rules 1.3(c), 1.4(a), and 1.5(b).

Mr. Brown refuses to acknowledge any fault in his representation of Mr. Bahri. Instead, in his briefing before the Board and before this court, he refers to Mr. Bahri as a "thief." Like the Board, we find it "deeply troubling to see a lawyer attack his own client baselessly merely to save his license. And of course, even a client who has committed a crime ought to have his phone calls returned."

Finally, Mr. Brown did not present, and neither the Board nor the hearing committee found, any mitigating circumstances.

Each of these seven factors weighs in favor of imposing substantial discipline on Mr. Brown. Therefore, we agree with the Board that a sixty-day suspension[4] is reasonable.

## B. Prove Fitness

We also adopt the Board's recommendation that Mr. Brown be required to prove his fitness to practice law before being reinstated to the Bar. The fitness requirement and the suspension serve different purposes. While the suspension serves as a "commensurate response to the attorney's past ethical misconduct," the fitness requirement addresses the concern "that the attorney's resumption of the

---

[4] As the hearing committee observed, the charges against Mr. Brown "could support a finding of misappropriation, which would dramatically increase the recommended sanctions." Indeed, disbarment—not suspension—is generally the appropriate sanction when an attorney recklessly or intentionally misappropriates client funds. *See In re Ponds*, 279 A.3d 357, 362 (D.C. 2022). Because disciplinary counsel did not allege misappropriation and did not seek disbarment, and because we generally "respect the Board's sense of equity in these matters unless the exercise of judgment proves to be unreasonable," *In re Smith*, 403 A.2d 296, 303 (D.C. 1979), we do not diverge from the Board's recommendation that Mr. Brown be sanctioned but not disbarred. Where an attorney is not found to have misappropriated client funds, this court has often imposed a brief suspension. *See e.g.*, *In re Lattimer*, 223 A.3d 437, 451-56 (D.C. 2020) (six months); *In re Fox*, 35 A.3d 441, 442 (D.C. 2012) (45 days); *In re Ifill*, 878 A.2d 465, 476-77 (D.C. 2005) (one year).

practice of law will not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest." *In re Lattimer*, 223 A.3d 437, 452-53 (D.C. 2020) (per curiam) (quoting *In re Cater*, 887 A.2d 1, 22 (D.C. 2005)) (internal quotation marks omitted).

We impose a fitness requirement when the disciplinary proceedings "contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *Id.* at 453. Specifically, we consider five factors: "(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law." *Id.* at 453 n.36 (quoting *In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985)).

As we explained above, the nature and circumstances of Mr. Brown's conduct were serious, a fact that has been made clear to Mr. Brown by Mr. Bahri, the hearing committee, and the Board. Nonetheless, Mr. Brown refuses to recognize the seriousness of his misconduct and continues to shift blame to his client. Nothing about Mr. Brown's conduct before the Board or this court suggests that his present legal work has improved over the course of the disciplinary-review process. To the

extent that Mr. Brown's briefing offers anything relevant to these factors, it is his statement that he is retiring and is simply continuing to serve previous clients, rather than actively seeking to bring in new business. Though Mr. Brown may now have only a limited client base, it is in the interest of the Bar and this court to ensure that those remaining clients receive competent and ethical legal services. Based on the record here, we are concerned that Mr. Brown "does not fully appreciate the ethical responsibilities and obligations that the practice of law requires." *In re Hallmark*, 831 A.2d at 377.

## C.      Restitution

Finally, we turn to the Board's order requiring Mr. Brown to pay $4,000 plus interest as restitution to Mr. Bahri. "When imposing discipline, the Court . . . may require an attorney to make restitution either to persons financially injured by the attorney's conduct or to the Clients' Security Trust Fund (see Rule XII), or both, as a condition . . . of reinstatement." D.C. Bar R. XI, § 3(b). Restitution is consistent with prior cases involving attorney dishonesty and misuse of client funds. *See In re Johnson*, 275 A.3d 268, 282 (D.C. 2022) (per curiam) (listing cases). Here, Mr. Brown took Mr. Bahri's $4,000 payment and then refused to perform his ethical duties or provide any benefit to Mr. Brown. Because attorneys may not unjustly enrich themselves off their client's fees, we adopt the Board's recommended

disposition requiring Mr. Brown to return the $4,000, plus interest, to Mr. Bahri.

## IV. Conclusion

We accept the Board's conclusion that Mr. Brown violated Rules 1.1(a), 1.3(a), 1.3(b)(1), 1.3(c), 1.4(a), 1.5(a), 1.15(e), and 1.16(d).  And we adopt the Board's recommendation to impose a sixty-day suspension from the practice of law and to require as a condition of reinstatement that Mr. Brown demonstrate his fitness and pay restitution to Mr. Bahri.  We direct Mr. Brown's attention to the requirements of D.C. Bar R. XI, § 14, and their effect on his eligibility for reinstatement.  *See* D.C. Bar R. XI, § 16(a).

*So ordered.*