*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 24-BG-0689

IN RE LARRY KLAYMAN, RESPONDENT.

A Suspended Member of the Bar
of the District of Columbia Court of Appeals
(Bar Registration No. 334581)

On Report and Recommendation
of the Board on Professional Responsibility
(BDN 18-BD-070)

(Argued May 29, 2025                    Decided August 7, 2025)

*Larry E. Klayman*, pro se.

*Julia L. Porter*, Deputy Disciplinary Counsel, with whom *Hamilton P. Fox III*, Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

Before BECKWITH, EASTERLY, and MCLEESE, *Associate Judges*.

PER CURIAM: Larry E. Klayman seeks to forestall a final order of discipline by this court after both an ad hoc hearing committee and then the Board on Professional Responsibility concluded that he violated numerous District of Columbia Rules of Professional Conduct in connection with his efforts to represent Cliven Bundy pro hac vice in the United States District Court for the District of

Nevada. We conclude that the failure by the hearing committee to issue its final report and recommendation within 120 days of the hearing, as required by the Board's rules, does not require dismissal of this proceeding, and we reject as unsupported Mr. Klayman's argument that this disciplinary proceeding violates his First Amendment rights. Finally, we accept most, though not all, of the Board's conclusions regarding Mr. Klayman's ethical violations, and we adopt the Board's recommended sanction that Mr. Klayman be suspended for eighteen months and demonstrate his fitness to practice law as a condition of his reinstatement to our Bar.[1]

## I.    Factual and Procedural Background

The factual record in this case is extensive. We largely adopt the findings of the Board's Report and Recommendation and limit our discussion below to an overview of the relevant events. Because the adequacy of Mr. Klayman's disclosure of his prior disciplinary history is at the heart of this case, we begin by discussing his first disciplinary proceeding in this jurisdiction. We then turn to Mr. Klayman's application for pro hac vice admission in the United States District Court for the

---

[1] After briefing, Mr. Klayman filed an expedited motion to stay this appeal, which was denied. After oral argument, Mr. Klayman renewed his motion to stay this appeal. With the issuance of this opinion, we deny the renewed motion.

District of Nevada—which was denied because the court determined that his disclosure was inadequate—and Mr. Klayman's many federal court filings seeking to challenge that denial. Finally, we discuss the disciplinary proceedings in this case.

## A. *Klayman I*

In 2013, the Office of Disciplinary Counsel (ODC) filed a Specification of Charges against Mr. Klayman in connection with multiple lawsuits he had filed against his former organization, Judicial Watch. ODC charged Mr. Klayman with violating Rules of Professional Conduct 1.9 (conflict of interest) and 8.4(d) (seriously interfering with the administration of justice). In 2014, Mr. Klayman signed a petition for negotiated discipline and an affidavit of negotiated disposition, in which he acknowledged "that he could not successfully defend against disciplinary proceedings based on the stipulated misconduct" and agreed to a sanction of public censure. Mr. Klayman subsequently reaffirmed these statements under oath at a hearing on the petition. But the negotiated discipline was not imposed because, in 2015, a hearing committee[2] determined that public censure was an "unduly lenient" sanction for Mr. Klayman's conduct.

---

[2] Hearing committees are made up of volunteers, with each committee composed of two members of the Bar and one person who is not a lawyer. D.C. Bar R. XI, § 4(e)(4).

The case was then assigned to a new hearing committee. Following a hearing in January 2016, the committee made a preliminary, non-binding determination that ODC had proven a violation of at least one rule. In June 2017, the hearing committee issued its final report, recommending that Mr. Klayman be suspended from the practice of law for ninety days with a fitness requirement. The Board issued its own report in February 2018, concluding that Mr. Klayman had violated D.C. Rule 1.9 and Florida Rule 4-1.9(a), and in June 2020 this court adopted the recommendation of the Board and suspended Mr. Klayman for ninety days. *In re Klayman*, 228 A.3d 713, 716 (D.C. 2020) (*Klayman I*).[3]

## B.    Pro Hac Vice Application

In 2016, Cliven Bundy, along with eighteen other defendants, was indicted by a federal grand jury in Nevada and charged with conspiracy, assault on a federal officer, obstruction of justice, and other crimes. Mr. Bundy retained Mr. Klayman— who was not licensed to practice law in Nevada—to represent him. Mr. Klayman and Joel Hansen, Mr. Bundy's local counsel, sought Mr. Klayman's pro hac vice admission to represent Mr. Bundy in the United States District Court for the District of Nevada.

---

[3] Throughout this opinion, we use *Klayman I* to refer both to the disciplinary proceeding generally, as well as to this court's published opinion in that matter.

In March 2016—nearly two months after the hearing committee made its preliminary finding of a rule violation in *Klayman I*—Mr. Klayman filed a verified petition for pro hac vice admission in the district court. The form petition required Mr. Klayman either to attest, among other things, that "there are or have been no disciplinary proceedings instituted against [him], []or any suspension of any license, certificate or privilege to appear before any judicial, regulatory or administrative body" or to "describe[]" such proceedings "in detail." As relevant to this case, Mr. Klayman disclosed that there was "a disciplinary proceeding pending before the District of Columbia Board of Professional Responsibility," which arose from "a claim by Judicial Watch," an organization he had founded, that Mr. Klayman "was in conflict of interest" by representing three individuals—"a former client, employee[,] and donor"—that Judicial Watch had "abandoned, sexually harassed[,] and defrauded." Mr. Klayman concluded the disclosure by stating, "The matter is likely to be resolved in my favor and there has been no disciplinary action."

Finding Mr. Klayman's disclosure of *Klayman I* to be "misleading and incomplete," the federal district court (Judge Navarro) denied his pro hac vice application without prejudice. The court had learned of the petition for negotiated discipline and Mr. Klayman's accompanying affidavit and concluded that his "admissions of three separate incidents of stipulated misconduct [had] not [been] clearly disclosed." The court instructed Mr. Klayman that, if he wished to "file a

new" application to appear pro hac vice, he would need to include specific additional information, including "verification" that *Klayman I* "has been resolved with no disciplinary action."

About a week later, Mr. Klayman filed a "supplement to and renewed" pro hac vice petition. He asserted that the court

> appears to have misunderstood the nature and current posture of the disciplinary proceeding underway [in the District of Columbia] .... [T]he prior attempted negotiated discipline never entered into effect and Mr. Klayman never chose to pursue any further proposed negotiated discipline as he . . . did not violate any ethical provision of the District of Columbia Code of Professional Responsibility. Bar Counsel and Mr. Klayman had attempted to resolve the matter by agreement, but Mr. Klayman later thought the better of having signed the affidavit and agreeing to [a] negotiated discipline [of] it since he feels strongly that he acted ethically at all times.

The district court denied Mr. Klayman's renewed petition, concluding that there was "no error with [the court's] prior ruling." The court ordered that the petition "shall remain denied without prejudice until such time as [Mr.] Klayman can provide proof that [*Klayman I*] has been resolved in his favor."

### C.    *Bivens* **Action and Motion to Disqualify Judge Navarro**

On May 10, 2016, Judge Navarro held a hearing on Mr. Bundy's appeal of a magistrate judge's order detaining him pending trial. At the hearing, which

Mr. Klayman attended, Mr. Bundy's local counsel, Mr. Hansen, asserted that Mr. Bundy was being held in solitary confinement. Judge Navarro stated that she was "not aware of any court order, either by this court or by any other judge that . . . would require that he be held in solitary," and she "encourage[d]" Mr. Bundy to use the "grievance system at the jail" if there was "some kind of an administrative reason why he's being held in solitary." Mr. Hansen then explained that, according to Mr. Bundy, Mr. Bundy "was being held in segregation from everybody else for protection," and Mr. Bundy had agreed to this arrangement because he had been told that "if they let him out and among other prisoners that he might be assaulted or killed because he was racist."

That same day, Mr. Bundy filed a *Bivens*[4] action against Judge Navarro and others, including Senator Harry Reid and President Barack Obama, seeking $50 million in damages, the removal of Judge Navarro from Mr. Bundy's case, and an order admitting Mr. Klayman pro hac vice to represent Mr. Bundy.[5] The complaint alleged, among other things, that Judge Navarro had "kept [Mr. Bundy] in solitary confinement" when Mr. Bundy had "done nothing to merit being held in solitary confinement." It also alleged, without factual basis, that Judge Navarro had denied

---

[4] *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).

[5] The *Bivens* complaint was signed only by Mr. Hansen. At the disciplinary hearing, Mr. Klayman agreed that he "helped with preparing the complaint."

Mr. Klayman's pro hac vice application under the "commands of her benefactors [Senator Reid and President Obama]" and that, "[a]s a Latino Democrat woman, [Judge] Navarro understood that she would be high on the list for a higher judicial or other appointment if she contributed . . . to have [Mr. Bundy] denied right of counsel of [Mr.] Klayman."

Less than two weeks later, Mr. Bundy filed a motion in his criminal case to disqualify Judge Navarro.[6] The motion once again asserted that Mr. Bundy was "in solitary confinement for no reason." It also alleged that Judge Navarro had an "incurable conflict of interest" because her husband was a local prosecutor; she was prejudiced against Mr. Bundy because she had been appointed by President Obama and recommended to the bench by Senator Reid; and "the cruel and unusual punishment" of "denying [Mr. Bundy] bail and leaving him to rot in solitary confinement" revealed that she was "carrying out [the] marching orders" of Senator Reid and President Obama. The district court denied the motion.

### D. Petitions for Writ of Mandamus

In July 2016, Mr. Klayman filed an emergency petition for a writ of

---

[6] The motion was signed by Mr. Hansen. Mr. Klayman also signed the motion as "Of Counsel," indicating under his signature: "Pro Hac Vice Application Pending." Mr. Bundy subsequently filed an errata indicating that Mr. Klayman's signature should not have been included on the pleading.

mandamus with the Ninth Circuit, arguing that Mr. Bundy's Sixth Amendment right to counsel would be violated if Mr. Klayman were not granted pro hac vice admission and touting his experience as a "former federal prosecutor and criminal defense lawyer." Judge Navarro filed an answer, explaining that the district court had "balanced [Mr. Bundy's] constitutional right to counsel with its grave apprehension . . . about [Mr.] Klayman's ethical misconduct." Judge Navarro offered multiple reasons for the court's concern, including Mr. Klayman's false statement in his second application that the negotiated petition in *Klayman I* had not gone into effect because he "later thought the better of having signed the affidavit and agreeing to negotiated discipline."

In an opinion written by Judge Bybee, the Ninth Circuit denied the petition, concluding that Mr. Klayman "has made misrepresentations and omissions to the district court regarding the ethics proceedings before the District of Columbia Bar; he has shown a pattern of disregard for local rules, ethics, and decorum; and he has demonstrated a lack of respect for the judicial process by suing the district judge personally." *In re Bundy,* 840 F.3d 1034, 1049 (9th Cir. 2016). While acknowledging that Mr. Bundy was "entitled to a fair trial, defended by competent, vigorous counsel of his choosing," the court concluded that this "right to such counsel does not extend to counsel from outside the district who has made it a pattern or practice of impeding the ethical and orderly administration of justice." *Id.*

Judge Gould dissented. He "recognize[d] that the ethical concerns of the majority and the district court, particularly their concern whether [Mr.] Klayman has been candid and forthcoming in his representations[,] . . . have some weight." *Id.* at 1054 (Gould, J., dissenting). Specifically, he opined that Mr. Klayman's initial disclosure of *Klayman I* had been "proper[]" and "accurate," but that the subsequent explanation in his renewed application "may have come near the line of lack of candor in explaining [the petition for negotiated settlement] away" and that Mr. Klayman "seem[ed] to have been, at the least, selective in his disclosures to the district court." *Id.* at 1054-55. Nonetheless, Judge Gould concluded that "the need to provide a vigorous defense for [Mr.] Bundy is a superordinate concern." *Id.* at 1056.

After unsuccessfully petitioning for rehearing en banc before the Ninth Circuit, Mr. Klayman filed an emergency petition for writ of mandamus at the Supreme Court in January 2017. Mr. Klayman again claimed that Mr. Bundy had been "ordered to solitary confinement for several weeks by Judge Navarro," and, to emphasize the urgency of the situation, he repeatedly asserted that Mr. Bundy's trial was scheduled to begin in just three weeks, on February 6, 2017.[7] He also stated

---

[7] In fact, Mr. Bundy was not scheduled to go to trial until thirty days after the conclusion of the trial of another set of related defendants, which would begin on February 6.

that Mr. Hansen had "little to no federal criminal experience" and that Brett Whipple, who had recently replaced Mr. Hansen as Mr. Bundy's local counsel, had "little experience in federal criminal defense."[8] Mr. Klayman also asserted that, in denying his pro hac vice application, Judge Navarro "failed to consider . . . the fact that the affidavit of negotiated discipline was later withdrawn by [Mr.] Klayman, as upon reflection he maintained that he did nothing wrong." The Supreme Court denied the petition. *In re Bundy*, 580 U.S. 1159, 1159 (2017).

Barely a week later, in March 2017, Mr. Klayman filed a second emergency petition for a writ of mandamus in the Ninth Circuit in which he alleged, among other things, that Judge Navarro had threatened to hold Mr. Whipple in contempt and that Mr. Klayman "has extensive experience in complex, contentious federal criminal defense," while Mr. Whipple "has none." Judge Navarro, in a filed answer, denied ever threatening Mr. Whipple with contempt; she also disputed Mr. Klayman's assertion that Mr. Whipple lacked the experience to represent

---

[8] But in an affidavit filed with the court several months earlier, Mr. Hansen had attested that he had "been through many federal criminal jury trials." Meanwhile, the federal district court would later present evidence that Mr. Whipple had "extensive federal criminal experience," including serving as a local public defender for seven years and serving as "an active member of the Las Vegas Criminal Justice Act Panel . . . for at least thirteen years," and had worked on ninety-nine federal criminal cases since 2004, including several "complex, multi-defendant cases."

Mr. Bundy, pointing to Mr. Whipple's extensive experience as a criminal defense attorney. *See supra* note 7. Mr. Klayman filed a reply brief with several attachments, including an affidavit from himself in which he attested that he was a "former prosecutor with the U.S. Department of Justice," that he had "extensive experience in complex federal criminal litigation," and that it was his "impression" that Mr. Whipple "lack[ed] the necessary federal criminal law experience to adequately represent Cliven Bundy." And Mr. Klayman repeated—without citing to any evidence—his allegation that Judge Navarro had threatened to hold Mr. Whipple in contempt.

A majority of the same panel of the Ninth Circuit that denied his first petition denied this second one, describing it as "procedurally irregular in a number of respects" and without merit. *In re Bundy*, 852 F.3d 945, 948-49 (9th Cir. 2017) (per curiam). The court determined that Mr. Klayman's claim that Judge Navarro had threatened to hold Mr. Whipple in contempt was unsupported and his assertions regarding Mr. Whipple's lack of criminal experience were "demonstrably false." *Id.* at 950-51. It concluded that Mr. Klayman had either failed to take basic steps to "ascertain the facts" about Mr. Whipple's extensive criminal law background or had "deliberately misled this court." *Id.* at 951. It also noted that Mr. Klayman had provided "[n]ot a single example" to support his claim that he himself had "extensive

experience in complex, contentious criminal defense."[9]  *Id.*

Mr. Klayman requested rehearing en banc, which the Ninth Circuit denied. He then filed a "Motion to Correct the Record Regarding False Allegations of Misstatements to this Court and the District Court," in which he reiterated his assertion that the petition for negotiated discipline in *Klayman I* "never entered into effect" because Mr. Klayman himself "chose to withdraw it."[10]  He also accused Judge Bybee (the author of the opinion denying his first petition for a writ of mandamus) of displaying "personal animus" towards both Mr. Klayman and Mr. Bundy and asserted that Mr. Bundy would "be filing a complaint with the Judicial Council and requesting a full investigation" into Judge Bybee.  The Ninth Circuit denied this motion.

Mr. Klayman continued in this vein for the next year and a half.  In June 2017, he filed a motion—which the Ninth Circuit denied—requesting that a new panel

---

[9] Judge Gould once again dissented for "essentially the same [reasons]" as before, explaining that he "continue[d] to believe that [Mr.] Bundy's needs for experienced defense counsel of his choosing are more important than the articulated concerns about Larry Klayman's ethics."  *In re Bundy*, 852 F.3d at 953 (Gould, J., dissenting).

[10] Acknowledging that the hearing committee had in fact rejected the negotiated petition, Mr. Klayman argued that his statements were nonetheless truthful because "he had continued to negotiate with the counsel for the D.C. Bar after it had rejected the initial [negotiated petition], but ultimately *did* decide to withdraw from negotiations and go to a hearing."

review his previous motion to correct the record, arguing that Judge Bybee should not be allowed to "rule on his own misconduct." Between July 2017 and October 2018, he filed two more petitions for a writ of mandamus with the Supreme Court and three more with the Ninth Circuit, each of which repeated essentially the same arguments and allegations.[11] Each petition was denied.

## E. Disciplinary Proceedings in the Present Case

In August 2018, ODC charged Mr. Klayman with violating several Rules of Professional Conduct in relation to the Bundy case. In July 2019, a hearing committee conducted the first phase of the hearing in this matter, at the conclusion

---

[11] For the sake of brevity, we do not go through each of these petitions in detail. We note, however, a few of the additional allegations that Mr. Klayman made in these filings.

For example, in his fourth mandamus petition to the Ninth Circuit, Mr. Klayman alleged, without citing any supporting evidence, that "Judge Bybee has close friendships and personal relationships and associations with Judge Navarro and Sen. Reid that have likely caused him to react negatively to Mr. Klayman and Mr. Bundy," and that "[i]t would appear that Judge Bybee was following the lead of the man who recommended him to the bench, Sen. Reid." Mr. Klayman further claimed that Judge Gould had "clearly and unequivocally found that Mr. Klayman had fulfilled his obligation of candor and truthfully answered all the questions presented to him in his pro hac vice application, and therefore should have been admitted," and that the majority's opinion to the contrary could "likely only be explained by Judge Bybee's close personal relationships, friendships, and associations with Judge Navarro and Sen. Reid."

In his third and fifth mandamus petitions before the Supreme Court, he asserted that Judge Gould "emphatically found" that Mr. Klayman had not been untruthful.

of which it was "unable to reach a non-binding determination" that Mr. Klayman had committed an ethical violation and so set a schedule for post-hearing briefing. In January 2020, after receiving the parties' briefs, the hearing committee made a "preliminary, non-binding determination that Disciplinary Counsel has proved at least one of the Rule violations charged"; the hearing committee thus "prepared to consider matters in aggravation and mitigation of sanction." *See* Bd. Pro. Resp. R. 11.11 (where, as here, the hearing committee does not reach a preliminary finding of a rule violation at the immediate conclusion of the first phase of the hearing, permitting a bifurcated hearing to determine, first, if any rule violations have been proved and, subsequently, what sanction should be recommended). The aggravation and mitigation portion of the hearing took place over two days in September 2020, during which Mr. Klayman put on testimony from ten character witnesses, and ODC argued that Mr. Klayman should be suspended for at least one year with a fitness requirement.

Three years passed. At last, in September 2023, the hearing committee issued its final report and recommendation, recommending that Mr. Klayman be sanctioned with a one-year suspension with a fitness requirement. Both Mr. Klayman and ODC filed notices of exceptions to the report, with Mr. Klayman arguing that the matter should be dismissed because of the delay before the hearing committee and ODC now arguing that Mr. Klayman should be disbarred. In July 2024, the Board issued

its own final report, largely adopting the factual findings of the hearing committee and concluding that Mr. Klayman committed most, though not all, of the charged violations. The Board recommended that Mr. Klayman be suspended for eighteen months with a fitness requirement.

## II. Discussion

We first consider and reject Mr. Klayman's procedural and constitutional objections to the disciplinary process and then evaluate the Board's conclusions regarding Mr. Klayman's ethical violations and its proposed sanction. We agree with most, though not all, of the Board's conclusions regarding rule violations and we adopt the Board's recommended sanction.

## A. Rule 12.2

Mr. Klayman argues that the hearing committee violated Rule 12.2 of the Rules of the Board on Professional Responsibility, which requires: "The Hearing Committee's report shall be filed with the Board not later than 120 days following the conclusion of the hearing," and that the entire disciplinary proceeding must therefore be dismissed. We agree that the hearing committee did not comply with

Rule 12.2 and that its three-year delay[12] in issuing its final report and recommendation was regrettable. But we are unpersuaded that dismissal is required for every violation of Rule 12.2, nor do we discern dismissal to be an appropriate response to the delay in this case.

To begin with, we have repeatedly held that Board Rule 12.2 (and D.C. Bar R. XI, § 9(a), which provides the same 120-day limit[13]) is "directory, rather than mandatory." *In re Rachal*, 251 A.3d 1038, 1041 (D.C. 2021) (quoting *In re Morrell*, 684 A.2d 361, 370 (D.C. 1996)); *see also In re Morrell*, 684 A.2d at 370; *In re Bernstein*, 774 A.2d 309, 316 n.14 (D.C. 2001); *In re Barber*, 128 A.3d 637, 642 (D.C. 2015); *In re Green*, 136 A.3d 699, 700 (D.C. 2016). This is consistent with the general principle that "statutory time limits[,] . . . where the statute fails to provide for a sanction, are 'directory rather than mandatory.'" *In re Smith*, 305 A.3d 826, 849 n.63 (D.C. 2023) (alterations omitted) (quoting *Spicer v. D.C. Real Est. Comm'n*, 636 A.2d 415, 418 (D.C. 1993)); *see also Cox v. United States*, 325 A.3d

---

[12] Mr. Klayman repeatedly characterizes the delay as lasting four years, starting the clock at the close of the first portion of the hearing (addressing the alleged rule violations) in July 2019. But the "conclusion of the hearing," as contemplated by Rule 12.2, did not come until the conclusion of the mitigation and aggravation portion in September 2020. *See* Bd. Pro. Resp. R. 11.11.

[13] The D.C. Court of Appeals promulgates the D.C. Bar Rules, which also grant the Board the power to "adopt" its own "rules, procedures, and policies not inconsistent with this rule or any other rules of this Court." D.C. Bar R. XI, § 4(e)(10). Board Rule 12.2 is functionally the same as Bar Rule XI, § 9(a).

360, 372 (D.C. 2024) (explaining that "statutory deadlines for court (or other official) action are presumptively not mandatory if the statute 'imposes a time limit within which a public official must act but does not specify the consequences of noncompliance'").

Mr. Klayman almost entirely ignores this line of cases, pointing instead to *Parrish v. District of Columbia*, for the proposition that "'shall' is 'a term which creates a duty, not an option.'" 718 A.2d 133, 136 (D.C. 1998) (quoting *Riggs Nat'l Bank v. District of Columbia,* 581 A.2d 1229, 1257 (D.C. 1990)). But this court has also said that "when a statute says that an agency 'shall' make a decision within a set period of time, that limit is generally considered 'directory rather than mandatory.'" *Brown v. D.C. Pub. Emp. Rels. Bd.*, 19 A.3d 351, 355 (D.C. 2011) (quoting *Spicer*, 636 A.2d at 418). And where, as here, this court has repeatedly interpreted the *specific* rule at issue to create only a directory, not a mandatory, rule, we are bound by those decisions. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971) (explaining that "no division of this court will overrule a prior decision of this court" (footnote omitted)).[14]

---

[14] At oral argument, Mr. Klayman argued that this court should overrule its prior cases and hold that Rule 12.2 is mandatory after all. But even if we agreed with Mr. Klayman's argument, this court may overrule prior precedent only when it sits en banc. *M.A.P.*, 285 A.2d at 312.

Mr. Klayman acknowledges just one of our prior cases addressing the time limit for the hearing committee's report, *In re Morrell*. He argues that it is "completely distinguishable" because "the time limit for the [hearing committee] to issue its Report was governed by the D.C. Bar Rules and not the Board Rules as is the case here" and because the committee in that case exceeded its deadline by only a matter of months. Not only do we fail to see a relevant distinction between the Board rules and the Bar rules, *see supra* note 12, but also this court has already *explicitly held* that the "directory, not mandatory" language applies to Board Rule 12.2, *In re Rachal*, 251 A.3d at 1041 (declining to treat Board Rule 12.2 differently than Bar R. XI § 9(a)). And while we recognize that a three-year delay is frustratingly long, Mr. Klayman has offered no reason why the length of the delay alone requires us to diverge from our prior case law. Indeed, at oral argument he agreed that, under his theory of the rule as a mandatory one, dismissal would be required if the hearing committee missed its deadline by just one day.[15]

---

[15] Mr. Klayman's allusion to case law that holds that "agencies such as the Board do not have the authority to ignore the rules which have been promulgated and imposed on them by a higher legislative authority, in this case, this Court" is unpersuasive. The Board is not an administrative agency and this court is not a legislature; in any event, as explained above, the rule is directory rather than mandatory.

In *In re Green* we explained that "mere delay without a showing of substantial prejudice poses no impediment to disciplinary action." 136 A.3d at 700. The only prejudice Mr. Klayman gestures at in this case is premised on a misrepresentation of the record. He asserts that after making a preliminary finding that he had committed no ethical violations when "the facts and evidence were fresh in the committee's minds," the hearing committee then "went silent" for "over four (4) years," *but see supra* note 11, and that during this time Mr. Klayman "very reasonably and rightly conclude[d] that this matter had been laid to rest." He goes on to say that it was only in September 2023 that the hearing committee "incredibly[,] without factual, legal and other bases[,] reversed course 180 degrees" to find that Mr. Klayman had, in fact, committed ethical violations. He suggests that, given this delay, the hearing committee must have "simply forgot or ignored everything that occurred at the hearing back in 2019" and resorted to "simply cop[ying] and adopt[ing] wholesale [ODC's] briefs."

Mr. Klayman's chronology is wrong. Although the hearing committee was "unable," at the close of the first portion of the hearing in July 2019, "to reach a non-binding determination" that Mr. Klayman had violated an ethical rule, it then ordered post-hearing briefing and, in January 2020, with the benefit of that briefing, determined that ODC *had* proven at least one violation. It is therefore not the case that the committee only changed its mind about his culpability years later, when

events were no longer "fresh" in its members' minds. Accordingly, we reject any suggestion of prejudice along these lines, and we note our concern that, in a disciplinary proceeding focused largely on Mr. Klayman's alleged dishonesty, he has misrepresented these facts to this court.

## B.     First Amendment

Mr. Klayman argues that this disciplinary proceeding is "First Amendment viewpoint selective prosecution." He states that he, "like many other prominent Republican and conservative public interest activist attorneys, has been targeted by the weaponized District of Columbia attorney discipline apparatus." But he directs us to no record support for the assertion that he was "targeted" because of his political viewpoints,[16] and we see no such support in the record developed before

---

[16] Mr. Klayman asks us to "take judicial notice" of what he alleges is widespread "weaponization of elements of our legal system." We decline to do so. "[J]udicial notice may be taken of facts that are 'well-known by all reasonably intelligent people in the community,' or 'so easily determinable with certainty from unimpeachable sources, [that] it would not be good sense to require formal proof.'" *Broome v. United States*, 240 A.3d 35, 42-43 (D.C. 2020) (quoting *Poulnot v. District of Columbia*, 608 A.2d 134, 141 (D.C. 1992)); *see also Judicial Notice*, Black's Law Dictionary (12th ed. 2024) (defining judicial notice as "acceptance . . . of a well-known and indisputable fact," such as "the fact that water freezes at 32 degrees Fahrenheit"). Mr. Klayman's allegation of widespread weaponization is not such a "well-known and indisputable fact." Rather, it is an allegation—one that Mr. Klayman, had he possessed the evidence to support it, could have substantiated before the factfinders in this case. *See Wonder Twins Holdings, LLC v. 450101 DC Hous. Tr.*, 326 A.3d 768, 775 n.2 (D.C. 2024) (explaining that "[a]s a general matter, [a]ppellate courts do not take evidence and

the hearing committee.[17]  Nor does he provide any developed argumentation in support of this claim.  *See Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("declin[ing] to entertain appellant's asserted but unanalyzed constitutional claim").  Accordingly, we reject this argument as factually and legally unsupported.

## C.    Ethical Violations

"When reviewing the Board's report and recommendation, we accept the Board's findings of fact where they are supported by substantial evidence, i.e., 'enough evidence for a reasonable mind to find sufficient to support the conclusion reached.'" *In re Carter*, 333 A.3d 558, 563 (D.C. 2025) (quoting *In re Johnson*, 298 A.3d 294, 308 (D.C. 2023)).  We review legal determinations de no novo.  *Id.* at 563-64.  "Such 'legal' determinations include the Board's resolution of 'ultimate

---

are bound to review a case based on the record developed by the parties in the trial court").

[17] Mr. Klayman purports to "incorporate" his "contemporaneously filed Motion for a Temporary Restraining Order and/or Preliminary Injunction and Motion for Reconsideration."  Pursuant to D.C. App. R. 28(a)(10)(A), parties must include in their briefs "an argument containing . . . the appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."  Accordingly, we decline to consider these other filings as "incorporated" into Mr. Klayman's brief.

facts,' i.e., 'whether the facts establish a violation of a Rule.'"  *Id.* at 564 (quoting *In re Evans*, 902 A.2d 56, 60 (D.C. 2006)).

As a preliminary matter, we reject Mr. Klayman's assertions that ODC "did not call a single substantive material witness" before the hearing committee, that the only evidence ODC offered was the "testimony" of its own counsel, and that it therefore could not have proven the charged ethical violations by "clear and convincing evidence." *See* Bd. Pro. Resp. R. 11.6 ("Disciplinary Counsel shall have the burden of proving violations of disciplinary rules by clear and convincing evidence.").  In addition to calling Mr. Klayman as a witness, ODC also introduced nearly two thousand pages of exhibits into evidence, and before this court Mr. Klayman does not challenge the admissibility of any of those exhibits.  As detailed below, the factual findings of the hearing committee and the Board were amply supported by these exhibits and Mr. Klayman's own testimony.[18]

We are also unconvinced by Mr. Klayman's assertion that "[t]he key point" is that he "was never sanctioned by any of the courts actually involved in his pro hac vice application or even referred to any bar association or court regulatory authority

---

[18] As for the claim that counsel for ODC was "testifying" when she asked him questions on direct and cross examinations, Mr. Klayman raised that objection many times at the hearing, and the hearing committee chairperson consistently rejected it. Mr. Klayman has offered no basis for us to conclude that disciplinary counsel's questioning constituted impermissible testimony, and we discern none.

by any of the parties involved."

> In return for the benefits of bar membership, members agree to be bound by Bar Rules and Rules of Professional Conduct, D.C. Bar R. II § 1 (providing that membership in the D.C. Bar is 'subject to due compliance with the conditions and requirements of such membership'), and to be subject to the disciplinary authority of this court and the Board, D.C. Bar R. XI § 1(a), no matter where the alleged misconduct occurs, D.C. R. Prof. Conduct 8.5(a).

*In re O'Neill*, 276 A.3d 492, 499 (D.C. 2022). And although this court regularly imposes reciprocal discipline when other courts have determined that an attorney barred in the District has violated their ethical rules, we retain authority to pursue disciplinary proceedings as an original matter. *In re Thompson*, 478 A.2d 1061, 1063 (D.C. 1984) (holding that "it is appropriate for both the Board and this court to consider conduct of attorneys that occurred outside of the District of Columbia, even where the other jurisdiction has declined to make that conduct the subject of a disciplinary proceeding").

Turning to the specific ethical violations at issue, the Board concluded that Mr. Klayman violated D.C. Rules of Professional Conduct 3.3(a), 8.1(a) and (b), 3.1, and 8.4(a), (c), and (d). We consider each of these violations in turn.

### 1. Violations related to lack of candor

The Board concluded that Mr. Klayman violated a number of ethical rules

related to a lawyer's duty of candor, including Rules 3.3(a)(1) ("A lawyer shall not knowingly . . . [m]ake a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." ), 8.1 ("An applicant for admission to the Bar, or a lawyer in connection with a Bar admission application[,] . . . shall not: (a) Knowingly make a false statement of fact; or (b) Fail to disclose a fact necessary to correct a misapprehension known by the lawyer or applicant to have arisen in the matter . . . ."), and 8.4(c) ("It is professional misconduct for a lawyer to . . . [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation.").

### a) Statements relating to *Klayman I* proceedings

The Board concluded that Mr. Klayman's "materially incomplete statements to courts regarding the status of the *Klayman I* proceedings and . . . his related failure to correct any misapprehension as to the nature and posture of these proceedings," including in his pro hac vice application, violated Rules 3.3(a), 8.1(a) and (b), and 8.4(c).

Mr. Klayman argues that he disclosed the existence of the *Klayman I* proceeding as required and that he was not required to disclose either the petition for negotiated settlement and accompanying affidavit or the hearing committee's preliminary determination that he had committed an ethical violation. He argues

that his disclosures were accurate, the Board imposed on him an "arbitrary, nebulous, and undisclosed" requirement of disclosure beyond what is contemplated by the ethical rules, and he "was entitled to and did give his opinion about the likely outcome of the disciplinary proceeding." Finally, he argues that his compliance with his duty of candor "is conclusively shown in the dissenting opinion of Judge Gould[,] which negates any possible showing of clear and convincing evidence of any ethics violations."

Mr. Klayman's disclosure in his initial pro hac vice application indicated the existence of a disciplinary proceeding in the District of Columbia and that it involved an alleged conflict of interest related to his representation of clients connected to his former organization, Judicial Watch. It did not include any reference to the petition for negotiated discipline and accompanying affidavit, in which he admitted to wrongdoing, or the hearing committee's preliminary finding of a rule violation, and thus arguably did not fulfill the application's requirement that he "describe" any disciplinary proceedings "in detail."

But there is more. Mr. Klayman also asserted in this application that this "matter is likely to be resolved in my favor and there has been no disciplinary action." Yet, at this point in time, Mr. Klayman knew that one hearing committee had already rejected his petition for negotiated discipline in the form of public

censure as "unduly lenient" and another had made the preliminary determination that he had committed an ethical violation. In light of those facts, his statement that the matter was "likely" to resolve in his favor cannot be considered a truthful one. Mr. Klayman argues he was "entitled to . . . give his opinion," but calling it an opinion cannot negate the misrepresentation inherent in the statement. *Cf.* Restatement (Second) of Torts § 539(1) (in the common law tort of misrepresentation, "[a] statement of opinion as to facts not disclosed and not otherwise known to the recipient may . . . be interpreted by [the recipient] as an implied statement . . . that the facts known to the maker are not incompatible with [the maker's] opinion"). Mr. Klayman was well aware of facts "incompatible" with the statement that the matter was likely to be resolved in his favor.

Mr. Klayman's assertions in his subsequent pro hac vice application, after the district court independently learned of the petition for negotiated discipline and rejected his initial petition, are likewise problematic. Mr. Klayman claimed that the negotiated petition "never entered into effect and [he] never chose to pursue any further proposed negotiated discipline as he . . . did not violate any ethical [rule]," and that he "later thought the better of having signed the affidavit and agreeing to [a] negotiated discipline [of] it since he feels strongly that he acted ethically at all times." These statements were clearly dishonest; if Mr. Klayman did not say outright that the petition for negotiated discipline was withdrawn of his own volition,

that was the (false) implication of his statement.[19]  *See In re Samad*, 51 A.3d 486, 496 (D.C. 2012) ("The term 'dishonesty' includes not only fraudulent, deceitful or misrepresentative conduct, but also 'conduct evincing a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness.'" (quoting *In re Shorter,* 570 A.2d 760, 767-68 (D.C. 1990) (per curiam))); *Shorter*, 570 A.2d at 768 (concluding that respondent's communications were dishonest where "respondent knew what information the IRS was after, but for his own benefit refrained from supplying that information even when asked questions that grazed the truth").

This court has consistently interpreted Rules 3.3(a)(1), 8.1, and 8.4(c) to encompass statements, such as Mr. Klayman's, that, though they might incorporate a grain of truth (Mr. Klayman may well have later thought better of agreeing to negotiated discipline), under the circumstances are clearly misleading.  *See In re Soto*, 298 A.3d 762, 766-67 (D.C. 2023) (holding that attorney violated Rule 8.1(a) by "omit[ing] critical details of a complex transaction to obscure his actions"); *In re Krame*, 284 A.3d 745, 757 (D.C. 2022) (agreeing that "'technically true' statements may nonetheless violate Rules 3.3(a)(1) and 8.4(c) if those statements omit material information with the intent to mislead"); *Samad*, 51 A.3d at 499 & n.8 (concluding

---

[19] In later filings Mr. Klayman made this point even more explicit, stating in his Motion to Correct the Record that "the 'prior attempted negotiated discipline never entered into effect' because he chose to withdraw it."

that "failure to correct" judge's "misimpression" "amounted to a 'false material statement'" in violation of Rule 3.3(a)(1)); D.C. R. Pro. Conduct 3.3 cmt. 2 (explaining that an attorney's duty of candor requires more than just refraining from outright lies, and "[t]here may be circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation"). Further, Mr. Klayman's express lack of candor was compounded by his notable omissions. Given his representations about the likely outcome of the proceeding, this was the time for him to also disclose the circumstances surrounding the rejection of the negotiated petition, as well as the hearing committee's preliminary finding, which both told a fundamentally different story than the one he was presenting to the court. He failed to do so.

We are unpersuaded by Mr. Klayman's argument that his truthfulness was "conclusively shown in the dissenting opinion of Judge Gould[,] which negates any possible showing of clear and convincing evidence of any ethics violations." First, we disagree that Judge Gould's dissent in the Ninth Circuit's denial of Mr. Klayman's first mandamus petition fully absolved Mr. Klayman of any ethical violations, much less violations of our Rules of Professional Conduct. *See supra* Part I.D; *infra* Part II.C.1.d. But even if Judge Gould had reached such a conclusion, his nonbinding dissenting opinion would not dictate our decision here. *See, e.g., Strange ex rel. Strange v. Islamic Republic of Iran*, 964 F.3d 1190, 1197 (D.C. Cir.

2020) (explaining that a dissenting opinion "'is not binding precedent' because it 'does not tell us how a majority of the [c]ourt would decide' the question" (quoting *Purcell v. BankAtlantic Fin. Corp.*, 85 F.3d 1508, 1513 (11th Cir. 1996)). Again, by virtue of his D.C. Bar membership, Mr. Klayman consented "to be subject to the disciplinary authority of this court and the Board." *In re O'Neill*, 276 A.3d at 499. Accordingly, we agree with the Board that Mr. Klayman's omissions and misrepresentations involving the *Klayman I* proceeding violated Rules 3.3(a), 8.1(a) and (b), and 8.4(c).

### b) Statements that pro hac vice status was "pending"

The Board determined that Mr. Klayman "participated in filing multiple pleadings which identified him as 'Of Counsel' and/or indicated '(Pro Hac Vice Application Pending)'" when his application had in fact "been denied," and that this violated Rules 3.3(a), 8.1(a), and 8.4(c).

Mr. Klayman first suggests that, if these are ethical violations, he cannot possibly be held accountable for them because "the responsible party [is] the attorney of record who signed the pleadings, Mr. Hansen," and "Mr. Hansen has not been subject to any discipline." Our jurisdiction extends only to D.C. Bar members, and the record does not indicate whether Mr. Hansen is a member of our Bar; in any event, Mr. Hansen's culpability, or lack thereof, is not the question before us today.

Nor is the issue whether Mr. Klayman can be held responsible for the full content of pleadings for which he was not the counsel of record. The only question is whether he can be held accountable for the contents of his own signature block. We have no difficulty concluding that he can and should be.

Mr. Klayman next argues that he was "at all times . . . attempting to gain pro hac vice admission" and that this is "the textbook definition of 'pending.'" We disagree. A matter is "pending" so long as it "[r]emain[s] undecided" or is "awaiting decision." *Pending*, Black's Law Dictionary (12th ed. 2024). That was not the case here. Once the district court denied his verified petition for pro hac vice admission without prejudice (and then again denied his renewed petition without prejudice), there was nothing "awaiting [a] decision," and thus nothing "pending" vis a vis Mr. Klayman's pro hac vice status. *Id.*; *see also Without Prejudice*, Black's Law Dictionary (12th ed. 2024) (explaining that this phrase indicates "that there has been no decision of the case upon the merits" and "leaves the whole subject as open to litigation *as if no proceeding had ever been had in the matter*" (emphasis added)). Accordingly, we agree that Mr. Klayman violated Rules 3.3(a), 8.1(a), and 8.4(c) in describing his application as pending on multiple filings.

### c) Statements regarding local counsel

The Board determined that Mr. Klayman violated Rules 3.3(a) and 8.4(c) by

making "knowing false statements inflating his own criminal trial experience while minimizing, or even negating, the criminal defense experience of Mr. Hansen and Mr. Whipple," and that he violated Rule 8.1(a) by making these statements in an "attempt[] to construct the false scenario for the courts, that without his appointment . . . Mr. Bundy would be denied the effective assistance of counsel." The Board acknowledges that Mr. Klayman "may have had some level of experience related to federal criminal defense work," but that "the broader issue is that [he] [falsely] represented that, as compared to Mr. Hansen or Mr. Whipple, he was the significantly more experienced federal criminal defense attorney."  Mr. Klayman argues that he "was entitled to his subjective opinion" that "he had 'extensive experience' in complex federal criminal litigation."  Similarly, he argues that he "properly provided his subjective opinion, to which he was also entitled, regarding the criminal defense experience of Mr. Bundy's local counsel, Mr. Hansen and Mr. Whipple."

We conclude the Board has the better side of the argument.  Even accepting Mr. Klayman's description of his own "extensive experience in complex federal criminal litigation" during his over forty years as an attorney based on his 400-600 hours of work on criminal defense cases (none of which he took to trial), and the two years he worked at the Department of Justice early in his career, Mr. Klayman's claims that Mr. Hansen had "little to no federal criminal experience" and that

Mr. Whipple had "little experience in federal criminal defense," or his claim that Mr. Whipple had "no[]" experience in "complex, contentious federal criminal defense," are not matters of "subjective opinion." These are statements of fact, not opinion, and they were false, as Mr. Klayman knew or should have known.

As the record indicates, Mr. Hansen had "been through many federal criminal jury trials" and Mr. Whipple had "extensive federal criminal experience." *See supra* note 7. Thus, as the Ninth Circuit concluded, "[a]t best," Mr. Klayman failed to take basic steps to "ascertain the facts" of local counsel's criminal experience and showed "such a casual acquaintance with the facts that he is guilty of at least gross negligence in his representations" on the subject. *In re Bundy*, 852 F.3d at 951.[20] And, as the

---

[20] We are unpersuaded by Mr. Klayman's argument that Mr. Bundy's decision to terminate Mr. Whipple serves as "strong evidence" that Mr. Whipple was unqualified for the job, since the record before us does not provide any explanation of the reason for that termination. We are similarly unpersuaded by Mr. Klayman's implication that Mr. Whipple's lack of qualification was proven by the fact that he "incredibly" admitted to Judge Navarro that he was not prepared for trial. The full transcript of the conversation to which Mr. Klayman refers indicates that Mr. Whipple "[had been] preparing for trial" but that he had "stopped all work" after Mr. Bundy terminated him. Lastly, we are unconvinced that Mr. Whipple's lack of familiarity with the process for filing a writ of mandamus—which in the Ninth Circuit as here is considered an extraordinary measure, *Rodriguez v. Lockheed Martin Corp.*, 627 F.3d 1259, 1267 (9th Cir. 2010) ("The writ of mandamus is an 'extraordinary' remedy limited to 'extraordinary' causes." (quoting *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1146 (9th Cir. 2005))); *Dist. of Columbia v. Fitzgerald*, 953 A.2d 288, 298 (D.C. 2008), *opinion amended on denial of reh'g,* 964 A.2d 1281 (D.C. 2009) ("It is well established that the writ of mandamus is an extraordinary remedy . . . .")—indicated that he lacked criminal

Board noted, "by the time [Mr. Klayman] repeated his claims about Mr. Whipple's lack of experience in his second mandamus petition to the Supreme Court," both Judge Navarro and the Ninth Circuit "had already determined those claims to be 'demonstrably false.'" *In re Bundy*, 852 F.3d at 951.

Accordingly, we agree with the Board that Mr. Klayman violated Rules 3.3(a), 8.1(a), and 8.4(c) in falsely describing the legal experience of local counsel relative to his own.

### d) Statements regarding Judge Gould's dissent

The Board concluded that Mr. Klayman violated Rules 3.3(a), 8.1(a), and 8.4(c) by "misrepresent[ing] Judge Gould's position as an emphatic assertion that [Mr. Klayman] had been candid and truthful." Mr. Klayman argues that he was entitled to his own "legal strategy in writing his briefs and how he advocates for his clients and himself, so long as he accurately quotes portions of the legal opinion he is relying upon," and that he "made no representation that Judge Gould's dissenting opinions were limited to the excerpted portions contained in his briefs." We are unpersuaded. Mr. Klayman repeatedly cited only to Judge Gould's statements that

---

defense experience. None of these arguments, even if true, would in any way contradict the indisputable record evidence of local counsel's prior criminal defense experience.

Mr. Klayman's initial "disclosure was accurate" and "compliant" and that he "agree[d] with [Mr.] Klayman that he was not obligated to re-litigate the D.C. proceeding before the district court and that he did not have to provide the district court with the entire record from D.C." or "disclose any possible blemish on his career or reputation beyond responding to the district court's further direct requests." *In re Bundy*, 840 F.3d at 1054-55 (Gould, J., dissenting). Mr. Klayman consistently omitted, however, the sentence that immediately followed the statement that the "disclosure was accurate," in which Judge Gould stated, "But then, after the district court discovered his Petition for Negotiated Disposition, he may have come near the line of lack of candor in explaining it away." *Id.* at 1054. Mr. Klayman also consistently omitted Judge Gould's assertion that "for [Mr. Klayman] to tell the district court that it was wrong about the negotiated discipline being in effect and to not also tell the court why the disposition lacked effect—its rejection by the bar committee—may have been a relevant omission." *Id.* at 1055. And Mr. Klayman did not acknowledge Judge Gould's ultimate conclusion that while the concerns about Mr. Klayman's lack of candor "have some weight" in assessing whether Mr. Klayman should be permitted to appear pro hac vice, Mr. Bundy's right to counsel of his choosing was ultimately more important. *Id.* at 1054, 1057.

Mr. Klayman did more than just selectively quote from Judge Gould's dissent. In multiple filings before the Ninth Circuit and the Supreme Court, he asserted that

Judge Gould "clearly and unequivocally found that Mr. Klayman had fulfilled his obligation of candor and truthfully answered all the questions presented to him in his pro hac vice application" and "emphatically found" that Mr. Klayman had not been untruthful. These statements are not true; Judge Gould's dissent quite clearly *did* equivocate, acknowledging the "weight" of the ethical concerns regarding Mr. Klayman's actions and noting that Mr. Klayman's failure to disclose the hearing committee's rejection of the negotiated discipline "may have been a relevant omission," *In re Bundy*, 840 F.3d at 1054-55, but nonetheless concluding that Mr. Bundy's rights won out. We thus agree that these statements constituted a violation of Rules 3.3(a), 8.1, and 8.4(c).

### e) Statements regarding trial start date

The Board found that Mr. Klayman violated Rules 3.3(a), 8.1(a) and (b), and 8.4(c) by making "a knowingly false statement" to the Supreme Court when he stated that Mr. Bundy's trial was scheduled to begin on February 6, 2017, when in fact it was not scheduled to begin until thirty days after the conclusion of another trial that would start on February 6. Mr. Klayman now argues that "[t]his is what [he] believed at the moment of filing and it is clearly not a misrepresentation of the facts at the time." He also argues that his "ultimate fundamental concern was that [he] be present at any of these [other] trials"; "trial dates are fluid"; and "at worst, this was

an unintentional error."

When questioned about this at the hearing, however, Mr. Klayman did not claim that he believed, at the time of this filing, that Mr. Bundy's trial was in fact scheduled to begin on February 6. Rather, Mr. Klayman stated that the scheduling order "was subject to the likelihood of being challenged further" and that he "needed to be present on February 6 whenever [Mr. Bundy's case] was being tried." In other words, he effectively conceded that his statements to the Supreme Court that Mr. Bundy's trial was scheduled to begin on February 6 were false.

We are thus persuaded that Mr. Klayman violated Rules 3.3(a), 8.1(a), and 8.4(c) when he falsely claimed before the Supreme Court, repeatedly and unequivocally, that Mr. Bundy's trial was scheduled to begin on February 6. We are not persuaded, however, that this also constituted a violation of Rule 8.1(b), which requires a "[f]ail[ure] to disclose a fact necessary to correct a [known] misapprehension." The Board offers no explanation of what the "misapprehension" was that Mr. Klayman failed to correct, and we can see none.[21]

---

[21] It does not seem to us to be the case that a "[k]nowingly . . . false statement" under Rule 8.1(a) also always satisfies the requisite "misapprehension" under Rule 8.1(b); otherwise, that would collapse entirely the distinction between these two subsections.

### f) Additional 8.4(c) violations

Lastly, the Board concluded that Mr. Klayman violated Rule 8.4(c) by making "recklessly dishonest" "statements that Judge Navarro ordered [Mr. Bundy] into solitary confinement"; "statements regarding Mr. Whipple being threatened with contempt in reckless disregard of whether they were false"; and "reckless[ly] false statements" claiming "that Judges Navarro and Bybee and Senator Reid were in a conspiracy to deprive Mr. Bundy of his constitutional rights."

Mr. Klayman argues that, with respect to the claims regarding solitary confinement and threats of contempt, he was relying on representations made to him by Mr. Bundy and Mr. Whipple, respectively. But Mr. Klayman was present for the hearing at which Judge Navarro questioned Mr. Hansen about the claim that Mr. Bundy was being held in solitary confinement by court order, at which time Mr. Hansen conceded that Mr. Bundy "was being held in segregation from everybody else for protection" and that Mr. Bundy had in fact agreed to this arrangement. Mr. Klayman never presented any non-speculative evidence to the contrary.[22]

---

[22] Mr. Klayman points to his own testimony at the disciplinary hearing as proof that he made these statements in good faith in reliance on Mr. Bundy's representations. There, he suggested that Mr. Bundy had told him that "he was immediately thrown in" to solitary and that if Mr. Bundy agreed to it, as Mr. Hansen

As for the threat of contempt, Mr. Whipple may well have told Mr. Klayman that this occurred. But after Mr. Klayman first alleged in his second Ninth Circuit mandamus petition, without evidence, that Judge Navarro had threatened Mr. Whipple with contempt, Judge Navarro filed an answer stating unequivocally that this was false. Mr. Klayman then repeated the assertion in his reply brief, still without citing any evidence. The Ninth Circuit, when it considered the matter, found no evidence to support Mr. Klayman's "double-hearsay" account that Judge Navarro had made such a threat. *In re Bundy*, 852 F.3d at 950.

Accordingly, we agree with the Board that Mr. Klayman violated Rule 8.4(c) with his assertions that Judge Navarro had ordered Mr. Bundy into solitary confinement and had threatened Mr. Whipple with contempt, statements which he made with, at a minimum, a reckless disregard for whether they were true. Mr. Klayman does not specifically address his statements regarding the alleged conspiracy between Judge Navarro, Judge Bybee, and Senator Reid, and we agree that these also constituted violations of Rule 8.4(c).

---

stated on the record, "that occurred later." When pressed on whether he was aware of Judge Navarro actually issuing an order placing Mr. Bundy into solitary, Mr. Klayman offered nothing but speculation, stating that she "d[idn't] have to issue an order" but could "communicate with the [M]arshal's office orally" and that "in one manner, shape or form I believe that there was [an order]" because Mr. Bundy "didn't get [to solitary] on his own."

## 2. Rules 3.1 and 8.4(a)

The Board concluded that Mr. Klayman had violated D.C. R. Pro. Conduct 3.1, which prohibits a lawyer from "bring[ing] or defend[ing] a proceeding, or assert[ing] or controvert[ing] an issue therein, unless there is a basis in law and fact for doing so that is not frivolous . . . ." The Board also concluded Mr. Klayman had violated D.C. R. Pro. Conduct 8.4(a), which prohibits a lawyer from "[v]iolat[ing] or attempt[ing] to violate the Rules of Professional Conduct, knowingly assist[ing] or induc[ing] another to do so, or do[ing] so through the acts of another."

The Board concluded that Mr. Klayman violated Rule 3.1 by making several factual allegations in the *Bivens* action and the motion to disqualify Judge Navarro, which he "lacked an objectively reasonable basis for asserting," including that:

> Judges Navarro and Bybee and Senator Reid were in a conspiracy to deprive Mr. Bundy of his constitutional rights; Mr. Whipple and Mr. Hansen did not have federal criminal litigation experience; Judge Navarro had ordered Mr. Bundy to be held in solitary confinement and threatened to hold Mr. Whipple in contempt; and, Judge Gould found that [Mr. Klayman] was truthful.

The Board also found that the *Bivens* action "was frivolous because judges have absolute immunity from suit" and that "the motion to disqualify was frivolous because an attorney may not sue a judge and then rely on that lawsuit as a basis to

disqualify the judge." The Board further concluded that Mr. Klayman "violated Rule 8.4(a) with respect to his participation in drafting and filing of the *Bivens* action and the motion to disqualify."

Mr. Klayman points to the fact that "[his] name does not appear in any signature blocks in either the *Bivens* Complaint or the Amended *Bivens* Complaint" and that he testified that he "did not file a *Bivens* action. Mr. Hansen filed it." He further argues that, because ODC did not call Mr. Hansen as a witness, "the record is devoid of any detail as to the extent of Mr. Klayman's participation in the preparation of the *Bivens* action." Similarly, he asserts that he "was not to be included as counsel on" the motion to disqualify Judge Navarro. Finally, he argues that he "testified and provided legal authority . . . that a *Bivens* action could possibly be brought against judges."

With respect to the *Bivens* motion, there is no dispute that Mr. Klayman was involved in its preparation. He conceded this at the disciplinary hearing, agreeing, "yes, I did help in preparing it." We agree with the Board that the *Bivens* action was frivolous: it included a number of factual allegations that "lacked an objectively reasonable basis," including many of the same false or misleading assertions discussed at length above. *See supra* Part II.C.1. *In re Spikes*, 881 A.2d 1118, 1125 (D.C. 2005) ("A [proceeding or issue] is frivolous if, after undertaking [an objective

appraisal of merit], a reasonable attorney would have concluded that there was not even a 'faint hope of success on the legal merits' of the action being considered.").[23] And because Mr. Klayman admitted that he assisted Mr. Hansen with its preparation, we are convinced that ODC proved that Mr. Klayman violated Rule 8.4(a) by "knowingly assist[ing] . . . another" to "[v]iolate or attempt to violate the Rules of Professional Conduct."

Because there is no evidence regarding the extent of Mr. Klayman's involvement in the filing, however, we cannot conclude based on this record that Mr. Klayman *himself* "br[ought] . . . a [frivolous] proceeding, or assert[ed] or controvert[ed] an issue therein." D.C. R. Pro. Conduct 3.1. Nor are we persuaded that ODC adequately proved that Mr. Klayman was involved in filing the motion to disqualify Judge Navarro. It is true that the initial filing listed Mr. Klayman's name as "Of Counsel," but Mr. Bundy subsequently filed an errata noting that that had been included in error. ODC did not question Mr. Klayman at the hearing regarding whether he had been involved in this filing as well as the *Bivens* complaint. The hearing committee appeared to implicitly accept ODC's argument that there was sufficient evidence to find that Mr. Klayman participated in the motion to disqualify

---

[23] Accordingly, we need not wade into the legal question whether a *Bivens* action may ever be brought against judges in their official capacity; we are persuaded that the *Bivens* action was frivolous based on its factual allegations alone.

because it was "consistent with [his] practice of retaliating and seeking to intimidate judges who rule against him." Although we agree that the motion resembled many of Mr. Klayman's other filings, such resemblance alone does not amount to clear and convincing evidence that Mr. Klayman was involved in its preparation. We thus conclude that ODC did not prove that Mr. Klayman violated Rule 3.1 with respect to the *Bivens* action, or Rules 3.1 or 8.4(a) with respect to the motion to disqualify.

### 3. Rule 8.4(d)

The Board determined that Mr. Klayman violated D.C. R. Pro. Conduct 8.4(d), which prohibits a lawyer from "[e]ngag[ing] in conduct that seriously interferes with the administration of justice." A violation of Rule 8.4(d) "requires improper conduct that 'bear[s] directly upon the judicial process . . . with respect to an identifiable case or tribunal' and 'taint[s] the judicial process in more than a de minimis way.'" *In re Pearson*, 228 A.3d 417, 426 (D.C. 2020) (alterations in original) (quoting *In re Hopkins*, 677 A.2d 55, 59-61 (D.C. 1996)); *see, e.g.*, *In re Yelverton*, 105 A.3d 413, 427 (D.C. 2014) (attorney violated Rule 8.4(d) by filing motions for mistrial and motions to recuse the judge that were "frivolous and contrary to settled precedent" and "repeatedly re-fil[ing] essentially the same motions in the hope of getting a different result, adding to the work of already burdened courts").

The Board concluded that Mr. Klayman "violated Rule 8.4(d) by failing to make material disclosures concerning *Klayman I* in connection with his pro hac vice application," which interfered with the administration of justice by "preventing a complete review of the applicant's character and fitness to practice law." Mr. Klayman does not respond to this claim, and we adopt the Board's conclusion on this point.

The Board further concluded that Mr. Klayman violated Rule 8.4(d) by "participating in the filing of the *Bivens* action and motion to disqualify Judge Navarro, continuing to file baseless and repetitive pleadings, and accusing Judges Bybee and Navarro of bias," and that his "conduct in this matter constituted a pattern and practice of improper retaliation and unmerited escalation."

Mr. Klayman argues that any suggestion that he committed an ethical violation by filing too many pleadings "was conclusively rebutted by the finding of pro bono expert Dean [Erwin] Chemerinsky that [the] number of filings that Mr. Klayman made w[as] reasonable, particularly under the circumstances of the case." But Dean Chemerinsky's summary testimony that filing five[24] petitions for a writ of mandamus "was reasonable under the circumstances"—without any

---

[24] Mr. Klayman filed five petitions for a writ of mandamus with the Ninth Circuit and an additional three with the Supreme Court.

discussion of the content of those filings—is hardly "conclusive," particularly where the Board explained that "the number of filings is not the source of an independent charge during these proceedings. Rather, it is the frivolous nature of the filings that constituted misconduct."[25] *See In re Pearson*, 228 A.3d at 427 ("Frivolous actions 'waste the time and resources of th[e] court, delay the hearing of cases with merit and cause . . . unwarranted delay and added expense.'" (quoting *In re Spikes*, 881 A.2d at 1127)).

We share the Board's view of these filings (minus the motion to disqualify Judge Navarro[26]). As discussed at length in the above sections, the filings reiterated false or misleading statements, ad hominem attacks, and arguments that had been repeatedly rejected by the courts. Nor is it enough that Mr. Klayman argues he was simply "trying to zealously serve a client he believed in." Even "heartfelt" actions "intended to benefit [the] client" are not necessarily "innocuous." *In re Yelverton*,

---

[25] In any event, even if Dean Chemerinsky had testified that he reviewed the filings and thought they had substantive merit, his opinion would neither be definitive proof that the filings were not frivolous nor be binding on the hearing committee or the Board. *See Ft. Myer Constr. Corp. v. Briscoe*, 298 A.3d 770, 777 (D.C. 2023) ("[F]actfinders in this jurisdiction are 'free to reject all or part of a witness'[s] testimony.'" (second alteration in original) (quoting *Kinard v. United States*, 416 A.2d 1232, 1235 (D.C. 1980))).

[26] As we concluded above, *see supra* Part II.C.2, ODC did not prove by clear and convincing evidence that Mr. Klayman was involved in filing the motion to disqualify Judge Navarro.

105 A.3d at 427-28 (repeated motions filed by attorney representing complainant seeking a mistrial after defendant's acquittal were frivolous and violated Rule 8.4(d)). As we concluded in *In re Yelverton*, so too we conclude here that Mr. Klayman's "numerous meritless, repetitive, and at times vexatious motions and other filings, considered in their totality, caused more than de minimis harm to the judicial process and violated Rule 8.4(d)." *Id.* at 428.

As for the conclusion that he violated Rule 8.4(d) by accusing Judges Navarro and Bybee of bias, Mr. Klayman doubles down, asserting that Judge Navarro's "bias and prejudice was not even a secret" and that, with respect to Judge Bybee, "there was nothing in the record to disprove Mr. Klayman's subjective opinion that he had exhibited extrajudicial bias and prejudice." He maintains that Judge Bybee is "*likely* friendly with Judge Navarro" (emphasis added) because they both practiced law in Las Vegas and Judge Bybee thus "sought to deflect from and insulate her inappropriate actions with regard to Mr. Bundy and his hoped-for counsel." Mr. Klayman has never presented any non-speculative evidence of bias by either judge, and we are persuaded that his continuous invocation of meritless personal attacks on these judges "seriously interferes with the administration of justice." D.C. R. Pro. Conduct 8.4(d); *see In re Pearson*, 228 A.3d at 427 (concluding that attorney violated Rule 8.4(d) with "litigation tactics" that "crossed the boundary into abusiveness," in part because his "'repetitive' motions" included "unfounded

allegations against the pre-trial judge").

## D. Sanction

In determining what sanction to impose, "we consider factors such as '(1) the seriousness of the conduct, (2) prejudice to the client, (3) whether the conduct involved dishonesty, (4) violation of other disciplinary rules, (5) the attorney's disciplinary history, (6) whether the attorney has acknowledged his or her wrongful conduct, and (7) mitigating circumstances.'" *In re Pearson*, 228 A.3d at 428 (quoting *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013)).

The Board recommends that Mr. Klayman be suspended for eighteen months, with a requirement that he show fitness before being permitted to return to the practice of law. We will adopt the Board's recommended sanction "unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar R. XI, § 9(h)(1). "In general, 'if the Board's recommended sanction falls within a wide range of acceptable outcomes, it will be adopted and imposed.'" *In re Baber*, 106 A.3d 1072, 1076 (D.C. 2015) (quoting *In re Vohra*, 68 A.3d 766, 771 (D.C. 2013)). We are persuaded that the

Board's recommendation of an eighteen-month suspension is within such a range.[27]

We agree with the Board that, with the exception of prejudice to Mr. Klayman's client—of which there is no evidence—each of the factors is aggravating for Mr. Klayman's sanction. The Board concluded: (1) Mr. Klayman's misconduct was serious because, "[o]ver a period of two years," he "repeatedly put forth the same false or misleading statements that he knew were not accurate"; (2) the "misconduct involve[d] extensive and repeated dishonesty before courts"; (3) Mr. Klayman violated multiple ethical rules; (4) Mr. Klayman has two instances of prior discipline;[28] and (5) Mr. Klayman "has neither acknowledged nor demonstrated remorse for his misconduct." We agree with this assessment. Moreover, the seriousness of Mr. Klayman's misconduct is exacerbated by his persistent falsehoods and misrepresentations even before this court in the present

---

[27] ODC argues that Mr. Klayman should be disbarred, pointing to "the nature and seriousness of Mr. Klayman's misconduct, his attitude, his false testimony, his testimony that he would not do anything different, his prior discipline, and his repetition of the same misconduct—including in these disciplinary proceedings." We are not unsympathetic to this argument; as we have already explained, we view Mr. Klayman's conduct as serious indeed. But for the reasons set forth below, we are of the view that this is a case in which we should defer to the Board's recommendation.

[28] In addition to *Klayman I*, Mr. Klayman was also disciplined by this court in 2022 in another matter, receiving a sanction of an eighteen-month suspension with a fitness requirement. *See generally In re Klayman*, 282 A.3d 584 (D.C. 2022) (*Klayman II*).

matter, as well as his relentless efforts to use the legal system as a weapon with which to attack anyone who tries to hold him to account for his misconduct.[29]

---

[29] Just as he repeatedly attacked Judges Bybee and Navarro in his filings in the Bundy matter, Mr. Klayman has filed countless lawsuits against nearly everyone involved in the Bar discipline process, in both their personal and official capacities, in relation to *Klayman I*, *Klayman II*, and the present case. These cases have been consistently dismissed by the courts. *See Klayman v. Fox*, No. 18-1579 (RDM), 2019 WL 2396538 (D.D.C. 2019), *aff'd sub nom.*, *Klayman v. Lim*, 830 F. App'x 660 (D.C. Cir. 2020); *Klayman v. Lim*, No. 18-2209 (RDM), 2019 WL 2396539 (D.D.C. 2019), *aff'd*, 830 F. App'x 660 (D.C. Cir. 2020); *Klayman v. Porter*, Nos. 20-3109 (RBW), 20-3579 (RBW) & 21-965 (RBW), 2022 WL 3715775 (D.D.C. 2022), *aff'd in part*, 104 F.4th 298 (D.C. Cir. 2024); Order, *Klayman v. Porter,* No. 2020-CA-000756-B (D.C. Super. Ct. Oct. 1, 2020); *Klayman v. Kaiser*, No. 21-0727 (ABJ), 2023 WL 8941317 (D.D.C. 2023), *aff'd*, No. 23-7020, 2023 WL 8890505 (D.C. Cir. 2023); *Klayman v. Blackburne-Rigsby*, No. 21-0409 (ABJ), 2021 WL 2652335 (D.D.C 2021), *aff'd*, No. 21-7069, 2022 WL 298933 (D.C. Cir. 2022); *Klayman v. Porter*, No. 22-953 (RBW), 2023 WL 2496738 (D.D.C. 2023), *appeal dismissed*, No. 23-7034, 2024 WL 137330 (D.C. Cir. 2024); *Klayman v. Porter*, No. 22-80642-CIV-SINGHAL, 2022 WL 4229383 (S.D. Fla. 2022), *aff'd*, No. 22-13025, 2023 WL 2261814 (11th Cir. 2023); Order, *Klayman v. Porter*, No. 9:22-cv-81295 (S.D. Fla. Sept. 30, 2022); Order, *Klayman v. Sataki,* No. 2022-CAB-005235 (D.C. Super. Ct. Mar. 1, 2024), *appeal docketed*, No. 24-CV-0226 (D.C. Mar. 8, 2024); *Klayman v. Bd. on Pro. Resp.*, 333 A.3d 1157 (D.C. 2025).

Even as this case was pending, Mr. Klayman filed suit against this court in the United States District Court for the District of Columbia. His filings in that case asserted yet more falsehoods, including that "[a]bsolutely nothing new was put into the record" between the close of first phase of the hearing in July 2019 and the issuance of the hearing committee's report in September 2023, when in fact both parties filed multiple briefs during that time and Mr. Klayman himself put on ten witnesses during the mitigation and aggravation hearing. Plaintiff's Motion for Preliminary Injunction at 8, *Klayman v. D.C. Ct. of Appeals*, No 24-cv-02997-RBW (D.D.C. May 14, 2025); Plaintiff's Response in Opposition to Defendants' Motion to Dismiss at 6-7, *Klayman v. D.C. Ct. of Appeals*, No. 24-cv-02997-RBW (D.D.C. Apr. 28, 2025). That case too was dismissed. *Klayman v. D.C. Ct. of Appeals*,

We are further persuaded that the Board's recommended sanction "falls within a wide range of acceptable outcomes." *In re Baber*, 106 A.3d at 1076 (quoting *In re Vohra*, 68 A.3d at 771); *see In re Edwards*, 278 A.3d 1171, 1172-75 (D.C. 2022) (two-year suspension with fitness requirement where the respondent was "reckless[ly]" dishonest on her pro hac vice application, "did not appreciate the seriousness of her misconduct" but instead "tr[ied] to make excuses for it," and had previously been disciplined for "strikingly similar misconduct"); *In re Tun*, 195 A.3d 65, 68, 74-76, 79 (D.C. 2018) (one-year suspension with no fitness requirement for attorney's "dishonesty to the court in [a] recusal motion" and "intentionally false testimony before the Hearing Committee"). We agree with Mr. Klayman that the cases cited by the Board are not identical to his case; no two cases ever will be. But we also find that Mr. Klayman has his own aggravating factors that those cases did not, including his continued dishonesty before this court and his persistent efforts to use the legal system to attack those who disagree with him. *See supra* note 28.

"To require proof of fitness as a condition of reinstatement after suspension, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *Klayman II*, 282 A.3d at 597 (quoting *In re Peters*, 149 A.3d 253, 260 (D.C. 2016)

---

No. 24-cv-02997-RBW, 2025 WL 1517247 (D.D.C. May 28, 2025), *appeal docketed*, No. 25-7079 (D.C. Cir. May 28, 2025).

(per curiam)).  We agree with the Board that Mr. Klayman "has given [this court] every reason to have a serious doubt that he will conform his conduct to the Rules in the future," including through his "persistent lack of candor with tribunals" and failure to "take[] responsibility for his actions."  As noted above, Mr. Klayman's briefing to this court in the present matter included multiple falsehoods and misrepresentations.  Accordingly, we agree that a fitness requirement is also warranted in this case.

For these reasons, we accept the Board's recommendation of an eighteen-month suspension with a fitness requirement.


*So ordered*.